642 A.2d 201

**In re ADOPTION/GUARDIANSHIP NO. 10941 in
the Circuit Court for Montgomery County.**

**No. 134, Sept. Term, 1993.**

Court of Appeals of Maryland.

Per Curiam Order April 14, 1994.

Opinion June 7, 1994.

100

Donna R. Heller, Asst. Atty. Gen., (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for petitioner.

Frani Cohen Wolfe, Rockville, Bernard J. Cooney, Silver Spring, for respondent.

## ORDER

PER CURIAM.

For reasons to be stated in an opinion later to be filed, a majority of the Court concurring, the Judgment of the Circuit Court for Montgomery County (Beard, J.), dated July 23, 1993, is hereby reversed and the case remanded to that court with directions that it forthwith grant the relief sought in the Guardianship Petition of the Montgomery County Department of Social Services. Mandate to be issued forthwith. Costs to be paid by the Respondent, Sandra L.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

KARWACKI, Judge.

This case originated with the filing of a petition for guardianship of a three year old boy in the Montgomery County Circuit Court by the Montgomery County Department of Social Services (the "Department" or "MCDSS"). We are asked to decide: (1) whether the offering of reunification services by the Department is a prerequisite to a court's termination of parental rights where the evidence overwhelmingly suggests that the only biological parent who is resisting such termination will never be fit to regain custody of her child; and (2) whether the trial court erred as a matter of law in denying the Department's petition for guardianship based on its finding that the termination of parental rights was not necessary to achieve permanency with the custodial grandparents. Because we answer the first question in the negative and the second question in the affirmative, we shall reverse the judgment of the trial court, denying the petition for guardianship.[1]

---

1. Following oral argument and the conference on this case, the Court issued the following *per curiam* order:

For reasons to be stated in an opinion later to be filed, a majority of the Court concurring, the Judgment of the Circuit Court for Montgomery County (Beard, J.), dated July 23, 1993, is hereby reversed

## I

The Maryland General Assembly has enacted a comprehensive statutory scheme to address those situations where a child is at risk because of his or her parents' inability or unwillingness to care for him or her. Title 5 of the Family Law Article of the Maryland Code (1984, 1991 Repl.Vol.) (hereinafter "F.L.") governs the custody, guardianship, adoption and general protection of children who because of abuse or neglect come within the purview of the Department of Human Resources. This case involves the interplay between the child welfare statutes, F.L. § 5–501 *et seq.*, under juvenile jurisdiction, and the adoption statutes, F.L. § 5–301 *et seq.*, under equity jurisdiction.

Subtitle 7 of Title 5 of the Family Law Article concerns the protection of children who have been abused or neglected by their biological parents. Pursuant to this subtitle, certain authority figures, such as health practitioners, police officers, educators and human service workers, are required to report cases of suspected abuse or neglect. F.L. § 5–704. The local department of social services is then required to investigate such reports. F.L. § 5–706. Thereafter, in accordance with its findings and treatment plan, the local department is required to render appropriate services in the best interests of the child,[2] including, when indicated, petitioning the juvenile court to commit the child to its care and custody. F.L. § 5–710(a). If the juvenile court determines that the child is a

_____

and the case remanded to that court with directions that it forthwith grant the relief sought in the Guardianship Petition of the Montgomery County Department of Social Services. Mandate to be issued forthwith. Costs to be paid by the Respondent, Sandra L.

**2.** The local department should first assist in preventing the necessity of removing the child from the child's natural parent or guardian. If removal does become necessary, the department should then attempt to reunite the child with the child's natural parent or guardian. Where efforts at reunification fail, however, the Legislature has provided a comprehensive statutory scheme to enable the child to find a permanent home with another family.

child in need of assistance (CINA),[3] it has discretion to order that the child be committed to the local department "on terms that the court considers appropriate ... including designation of the type of facility where the child is to be accommodated, until custody ... is terminated with approval of the court" or the child turns 21 years old. Md.Code (1974, 1989 Repl.Vol.) §§ 3–820(c)(1)(ii) and 3–825 of the Courts & Judicial Proceedings Article. Such out-of-home placement can include placement in a licensed foster home, F.L. § 5–525, or placement with relatives.

During the 1970's, nationwide concern grew regarding the large number of children who remained out of the homes of their biological parents throughout their childhood, frequently moved from one foster care situation to another, thereby reaching majority without belonging to a permanent family. This phenomenon became known as "foster care drift" and resulted in the enactment by Congress of Public Law 96–272, the "Adoption Assistance and Child Welfare Act of 1980," codified at 42 U.S.C. §§ 670–679 (1988). One of the important purposes of this law was to eliminate foster care drift by requiring states to adopt statutes to facilitate permanent placement for children as a condition to receiving federal funding for their foster care and adoption assistance programs.

Under the federal act, a state is required, among other things, to provide a written case plan for each child for whom the state claims federal foster care maintenance payments. 42

---

**3.** Md.Code (1974, 1989 Repl.Vol., 1993 Supp.), § 3–801 of the Courts and Judicial Proceedings Article defines "child in need of assistance" thusly:

"(e) *Child in need of assistance.*—'Child in need of assistance' is a child who requires the assistance of the court because:

(1) He is mentally handicapped or is not receiving ordinary and proper care and attention, and

(2) His parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and his problems provided, however, a child shall not be deemed to be in need of assistance for the sole reason he is being furnished nonmedical remedial care and treatment recognized by State law."

U.S.C. § 671(a)(16). The case plan must include a description of the home or institution into which the child is placed, a discussion of the appropriateness of the placement, and a description of the services provided to the parents, child and foster parents to facilitate return of the child to his or her own home or to establish another permanent placement for the child. 42 U.S.C. § 675(1). The state must also implement a case review system that provides for administrative review of the case plan at least every six months and judicial review no later than eighteen months after placement and periodically thereafter. 42 U.S.C. § 675(5)(B) and (C). The purpose of the judicial review is to "determine the future status of the child" including whether the child should be returned to its biological parents, continued in foster care for a specified period, placed for adoption, or because of the child's special needs or circumstances, continued in foster care on a long term basis. 42 U.S.C. § 675(5)(C).

Maryland receives considerable federal funds pursuant to this Act. Accordingly, the Maryland General Assembly has enacted legislation to comply with the federal requirements. Under Maryland's statutory scheme, for those children committed to a local department of social services the department is required to develop and implement a permanency plan that is in the best interests of the child. F.L. § 5–525.

In developing the permanency plan, the department is required to consider a statutory hierarchy of placement options in descending order of priority. F.L. § 5–525(c). First and foremost, the department must consider returning the child to the child's natural parents or guardians. F.L. § 5–525(c)(1). If reunification with the biological parents is not possible, the department must consider placing the child with relatives to whom adoption, guardianship, or care and custody, in descending order of priority, are planned to be granted. F.L. § 5–525(c)(2). If placement with relatives is not possible, then the department must consider adoption by a current foster parent or other approved adoptive family. F.L. § 5–525(c)(3). Only in exceptional situations as defined by rule or

regulation is a child to be placed in long term foster care. F.L. § 5–525(c)(5).

If it is determined that reunification is not possible and that adoption is in the child's best interests, the juvenile court lacks jurisdiction to finalize this plan. *In re Darius A.*, 47 Md.App. 232, 235, 422 A.2d 71, 72 (1980); *see also* F.L. § 1–201. Instead, unless the parents consent to the adoption of their child, the department is required to petition the circuit court for guardianship pursuant to F.L. § 5–313. If the circuit court finds by clear and convincing evidence, after considering the statutorily enumerated factors, that it is in the best interest of a child previously adjudicated a CINA for parental rights to be terminated, the circuit court has authority to grant the department's petition for guardianship. Such award carries with it the right for the department to consent to the adoption of the child. F.L. §§ 5–311 and 5–317(f).

The overriding theme of both the federal and state legislation is that a child should have permanency in his or her life. The valid premise is that it is in a child's best interest to be placed in a permanent home and to spend as little time as possible in foster care. Thus, Title 5 of the Family Law Article seeks to prevent the need for removal of a child from its home, to return a child to its home when possible, and where returning home is not possible, to place the child in another permanent placement that has legal status. With these goals in mind, we turn to the facts of the instant case.

## II

Sandra L., now forty years of age, has had severe psychiatric problems since the age of twelve. She has been involuntarily hospitalized at Springfield State, Holy Cross, Shady Grove Adventist and Washington Adventist hospitals for various periods of time, ranging from three months to a year. She has been diagnosed as schizophrenic, mentally retarded, and perhaps autistic.

Sandra L. gave birth to her first child when she was 14 years old. The child was placed for adoption at birth. San-

dra's second child, Viola, born in 1988, was voluntarily placed at birth by Sandra with the maternal grandparents. At the time of the guardianship hearing in the instant case, the grandparents had filed a petition in the circuit court to adopt Viola.

On June 7, 1990, Sandra L. gave birth to her third child, Ivan M., at the Shady Grove Adventist Hospital. On June 11, 1990, the hospital called the Montgomery County Department of Social Services to report concerns that the child would be at risk if he left the hospital with his mother. After investigating, the Department filed a petition in the District Court of Maryland, which exercises juvenile jurisdiction in Montgomery County, *see* § 3–801(i) of the Courts and Judicial Proceedings Article, alleging that Ivan M. was a CINA. On June 15, 1990, Ivan was placed with the maternal grandparents, pending further proceedings in the juvenile court.

On July 11, 1990, the juvenile court adjudicated Ivan a child in need of assistance.[4] Both Sandra and Ivan's father, an illegal alien from Nicaragua, attended the adjudicatory hearing and signed a service agreement. That agreement between Ivan's parents and the Department provided that all parties would undertake certain responsibilities and actions to provide for Ivan's well being.[5] Pursuant to the agreement, the Department referred the family for a psychological evaluation by the court's diagnostic team ("SEDS"). The caseworker also

---

**4.** At a disposition hearing on October 3, 1990, the juvenile court committed Ivan to the custody of the Department for continued placement with his grandparents.

**5.** Under the service agreement the parents agreed to: 1) visit Ivan once per week; 2) attend parenting classes; 3) obtain stable housing and inform the social worker of the address and telephone number there; 3) contact the social worker by telephone once each week; and 4) keep an appointment for a psychological evaluation by the juvenile court's diagnostic team ("SEDS").

The social worker agreed to: 1) facilitate and arrange visits between Ivan and the parents; 2) facilitate parenting classes; and 3) arrange for Sandra to be taken to the SEDS evaluation.

Ostensibly, fulfillment of the terms of the service agreement by Sandra was the first step towards Sandra obtaining custody of Ivan.

referred the mother to parenting classes to begin in September. A prerequisite to attending these classes, however, was completion of the SEDS evaluation.

In late July of 1990, Ivan's father was incarcerated for raping one of Sandra's retarded girlfriends. He was subsequently transferred to the custody of the federal Immigration and Naturalization Service, and on July 9, 1992, he was deported to Nicaragua. During this entire two-year period, the father did not contact either the Department or Ivan.

Sandra's behavior following the rape by Ivan's father and his subsequent deportation are illustrative of Sandra's troubled psyche. When Sandra learned of the rape, her reaction was so severe that the police were summoned and took her to a crisis center. The crisis center arranged for Sandra to be hospitalized for a two-week period during August of 1990. The caseworker assigned to Sandra's case visited her at the hospital, bringing a bowl of fruit. Sandra ate all of the fruit during the visit. When the caseworker attempted to discuss plans for Ivan, Sandra became very angry. At the end of Sandra's two-week stay at the crisis center, her psychiatrist recommended that she transfer to a community psychiatric clinic in Gaithersburg to continue treatment. Although the Department attempted to facilitate this, Sandra refused. Instead, she moved back to her apartment.

The next week, the caseworker went to Sandra's apartment to transport her to the SEDS evaluation. When the caseworker commented that Sandra must be happy to be out of the hospital, Sandra denied that she had been in the hospital. When the caseworker reminded her about the fruit, Sandra said, "That wasn't me, that was my twin sister." [6] The caseworker nevertheless took Sandra to the SEDS evaluation, but upon arrival, Sandra refused to speak with the psychiatrist, repeatedly stating that "there's nothing wrong with me." Consequently, the caseworker took Sandra home.

---

6. Sandra does not have a twin sister.

A family evaluation which was to include Sandra, the grand-parents and Ivan was scheduled for another day. The case-worker transported Sandra to the appointment. In the wait-ing room, Sandra began clawing and scratching the grand-mother. After the grandfather and a staff person separated them, Sandra refused to participate in the evaluation.

Other efforts to help Sandra were similarly rebuked. In October of 1990, Sandra was facing eviction from her apart-ment in Gaithersburg. The caseworker referred her to Adult Protective Services to help her obtain housing. Sandra moved, however, to an apartment in Takoma Park where she lived with Jose R. until her eviction in June, 1991.[7]

The caseworker also attempted to arrange mental health services for Sandra through a community outreach program that specializes in case management of persons with mental illness. On five occasions, the social worker from the outreach program tried to contact Sandra to discuss the program. Sandra, however, refused to allow the social worker into her home and threatened to call the police.

From September 1991, until September 1992, Sandra lived in yet another apartment in Takoma Park. The Department's caseworker testified at the guardianship hearing that in Feb-ruary 1992, she visited Sandra and discovered five cats in the apartment, cat feces all over the apartment, and cockroaches running up and down the walls. She further testified that:

> "There were many things in boxes. There was something fermenting on the kitchen floor. There was a horrible smell of urine. It was very, very difficult going into the apart-ment. The windows were open; however, it was very difficult staying in there and going in there."

In September 1992, Sandra, Jose R., and Jose R.'s sister and boyfriend moved into a one-bedroom apartment where they lived for exactly one month. The caseworker visited that

---

7. Jose R. is the father of Sandra's fourth child, who was born in May, 1992. At the time of the guardianship hearing below, Sandra was pregnant with another child by Jose R.

apartment but Sandra would not speak with her. Less than one month later, the occupants of the apartment were evicted. Jose R., his sister and her boyfriend moved into a house in Silver Spring.[8] Sandra moved into a homeless shelter where she remained until the shelter closed for the summer on April 30, 1993.

During the month of May 1993, Sandra stayed at another shelter. During this time, Sandra refused assistance in moving to a shelter that attends to mentally ill homeless persons because she was unwilling to accept the required case management and mental health services. The caseworker then tried unsuccessfully to arrange for supervised housing through the Developmental Disability Administration.

The caseworker also attempted to facilitate visitation for Sandra with Ivan. In accordance with the service agreement, Sandra was to telephone the caseworker weekly to arrange for supervised visits at the Department. The grandmother told Sandra that she could visit Ivan at any time in the grandmother's home. Despite these arrangements, Sandra rarely visited Ivan. During one visit at the grandmother's home, Sandra swore at the grandparents and threw furniture. At a supervised visit at the Department, the caseworker observed that Sandra never looked at Ivan. Sandra failed to come for a third visit scheduled at the Department in March, 1992.

On several occasions, Sandra talked with the caseworker at length about her desire to get her children back and that she "just wanted her parents to be dead." In September 1992, Sandra accused her parents of having illegal custody of her children. When the caseworker assured Sandra that the grandparents' custody was legal, Sandra became angry. She has refused to talk with the caseworker about Ivan since that day. At the time of the guardianship hearing, neither the caseworker nor the grandmother knew where Sandra was living.

---

8. Like Ivan's father, who was deported to Nicaragua, Jose R. was deported to El Salvador in April 1992, because of crimes committed in the United States.

Ivan has been diagnosed with severe language disabilities and developmental problems. His grandparents have been very responsive to his special needs. Initially, they enrolled him in an infant and toddler program that met three days a week. However, when he failed to progress, his grandmother worked closely with the school system to have him placed into a special education program that meets five days a week and includes speech therapy. The grandmother attends all of the required meetings at the school.

All evidence adduced at the guardianship hearing demonstrated that the grandparents were providing a stable, supportive and nurturing environment for both Ivan and his sister Viola. At the time of the guardianship hearing, the grandparents had begun the adoption process for Viola. The grandparents also wish to adopt Ivan, and the Department wishes to facilitate this adoption. Sandra did not attend the guardianship hearing even though she had been personally notified of its date by her court appointed attorney, who offered no evidence at the hearing.

On July 30, 1993, the trial court denied the Department's Petition for Guardianship, stating that "the Movant has not proven by clear and convincing evidence that termination of the parents' rights is in the Child's best interest." The trial judge agreed with the Department that it was in Ivan's best interest to remain in the home of his grandparents; however, he denied the Department's petition for guardianship because he determined that it was not necessary to terminate parental rights in order to achieve permanency for Ivan. The judge further found that "[t]he State did not meet its obligation to attempt to reunify the Mother and the Child by affirmatively offering and providing services." The Department appealed to the Court of Special Appeals. On November 16, 1993, the Department petitioned this Court to issue a writ of certiorari. On December 21, 1993, we granted the Department's petition before any consideration of the appeal by the intermediate appellate court.

### III

When a natural parent will not consent to the adoption of his or her child, a petition for guardianship is oftentimes filed by the child placement agency or the child's attorney so that the agency can be granted guardianship prior to the prospective adoptive parents petitioning for adoption. *See* F.L. §§ 5–313, 5–317. The granting of a petition for guardianship carries with it the termination of the parental rights of both parents, as well as elimination of the need for further consent by the natural parents to an adoption of the child. F.L. § 5–317(f).[9] Section 5–313 provides that a court may grant a decree of adoption or guardianship without the natural parents' consent if the court finds by clear and convincing evidence that: (1) it is in the best interest of the child to terminate the natural parents' rights, and (2) if in a prior juvenile proceeding, the child has been adjudicated a CINA.

The "best interest" standard has long been the one used in deciding contested adoption cases in Maryland. *In re: Adoption/Guardianship No. A91–71A,* 334 Md. 538, 559, 640 A.2d 1085, 1095 (1994); *Wash. Co. Dep't Soc. Serv. v. Clark,* 296 Md. 190, 461 A.2d 1077 (1983); *Shetler v. Fink,* 231 Md. 302, 190 A.2d 76 (1962). This standard also applies in contested custody cases, *id.,* and in cases involving termination of parental rights. *In re Adoption No. 87A262,* 323 Md. 12, 19, 590 A.2d 165 (1991). The standard applies to disputes between two natural parents or between a natural parent and a third party. *In re Adoption/Guardianship No. A91–71A, supra.*

Another important interest that must be considered, however, is the right of a parent to raise his or her child. This right, recognized by constitutional principles, common law and statute, is so fundamental that it may not be taken away unless clearly justified. "When the State initiates a

---

9. A guardianship decree can also carry with it the right of the guardian to consent to adoption of the child by another person, as was the case with Ivan M.

parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer,* 455 U.S. 745, 759, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599, 610 (1982). Justice Blackmun, dissenting in another case, described a parent's interest as follows:

> "At stake here is the interest of a parent in the companionship, care, custody, and management of his or her children. This interest occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility. Far more precious ... than property rights, parental rights have been deemed to be among those essential to the orderly pursuit of happiness by free men...."

*Lassiter v. Department of Social Services,* 452 U.S. 18, 38, 101 S.Ct. 2153, 2165, 68 L.Ed.2d 640, 656–57 (1981) (citations omitted). Similarly, we have said that,

> "adoption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships has led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent."

*Walker v. Gardner,* 221 Md. 280, 284, 157 A.2d 273, 275–76 (1960).

 We have made clear, however, that the controlling factor in adoption and custody cases is not the natural parent's interest in raising the child, but rather what best serves the interest of the child. *In re: Adoption/Guardianship No. A91–71A, supra, Lippy v. Breidenstein,* 249 Md. 415, 420, 240 A.2d 251 (1968), *Ex Parte Johnson,* 247 Md. 563, 569, 233 A.2d

779 (1967).[10] We recently said that "in all cases where the interests of a child are in jeopardy the paramount consideration is what will best promote the child's welfare, a consideration that is of 'transcendent importance.'" In re: *Adoption/Guardianship No. A91–71A,* 334 Md. at 560, 640 A.2d at 1096.

In order to guide the courts in determining what is in the best interests of the child in a termination of parental rights proceeding, the General Assembly has enumerated a number of factors in F.L. § 5–313(c) and (d). Those subsections provide in relevant part:

5–313. Same—Guardianship; adoption in general.

\* \* \* \* \* \*

(c) *Required considerations.*—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall consider:

(1) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(2) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(3) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(4) the child's adjustment to home, school, and community;

(5) the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to

---

**10.** *But see Ross v. Pick,* 199 Md. 341, 86 A.2d 463 (1952) (there is a prima facie presumption that a child's welfare will be best served in the care and custody of its parents rather than in the custody of others).

make it in the best interest of the child to be returned to the natural parent's home, including:

(i) the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give significant weight to any incidental visit, communication, or contribution;

(ii) if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

(iii) the maintenance of regular communication by the natural parent with the custodian of the child; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months from the time of placement, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent's rehabilitation; and

(6) all services offered to the natural parent before the placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals.

(d) *Considerations following juvenile adjudication.*—

(1) In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in a case involving a child who has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child, the court shall consider the factors in subsection (c) of this section and whether any of the following continuing or serious conditions or acts exist:

(i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time;

\*    \*    \*    \*    \*    \*

(3) The court shall consider the evidence under paragraph (1) of this subsection regarding continuing or serious conditions or acts and may waive the child placement agency's obligations under subsection (c) of this section if the court, after appropriate evaluation of efforts made and services rendered, finds by clear and convincing evidence that the waiver of those obligations is in the best interest of the child.

In denying the Department's Petition for Guardianship in the instant case, the trial judge made several findings on which he based his decision. Most significantly he found that (1) the State did not meet its obligation to attempt to reunify Sandra and Ivan by affirmatively offering and providing services and (2) termination of Sandra's parental rights was not necessary in order for Ivan to stay in the custody of his grandparents. We will address each of these conclusions separately.

## A

In denying the Petition, the trial judge adopted Sandra's proposed findings of fact and conclusions of law. With regard to the Department's efforts at reunification, the Judge therein stated:

"Appropriate services have not been offered to the Mother by the Montgomery County Department of Social Services. The State did not meet its obligation to attempt to reunify the Mother and the Child by affirmatively offering and providing services. As a result of her childhood experiences with mental health professionals, the Mother does not trust psychologists, and would not submit to evaluation by MCDSS. Josie Traum testified that unless the Mother submitted to an evaluation, the Department would not provide reunification services and parenting courses. No attempt was made to resolve this impasse in order to benefit the family.

The social worker took no affirmative action in setting up specific times for the Mother to visit with the Child. . . .

[T]he burden of initiating arrangements for visitation was placed on the Mother, who was told by Ms. Traum, to telephone in order to arrange for visitation. Ms. Traum testified that to her knowledge, the mother had no telephone.

Despite the knowledge that the Mother did not trust Ms. Traum and refused to talk to her, MCDSS refused to remove Ms. Traum from the case. Visitation was rarely scheduled. When there was to be visitation, it was supervised by Ms. Traum. . . .

The case worker has failed to comply with the service agreements which were introduced in evidence. Although the Mother did not visit with her son or attend parenting classes as provided for in the service agreements, the agreements provided that the case worker was to facilitate and arrange visitation between the Mother and Child. The case worker did not do this. The case worker made the provision of services, such as helping the mother attend parenting classes, dependent upon the Mother's evaluation by SEDS, an evaluation to which the Mother could not consent. This action deprived the Mother of the benefit of services which were needed in order to reunite her with her son."

The problem with the trial judge's analysis is that he failed to recognize that no amount of reunification services are likely ever to allow Sandra to get custody of her children. Assuming without deciding that the Department failed to meet its statutory duty to facilitate reunification,[11] where, as in this case, attempts at reunification would obviously be futile, the Department need not go through the motions in offering services doomed to failure.

---

**11.** We do not agree with Sandra that the Department failed to provide services reasonably designed to facilitate reunification. It appears, based on the record, that reasonable efforts were made by the Department, but that it was Sandra who failed to take advantage of those services. This determination, however, is not central to our holding in this case.

■ The evidence in this case overwhelmingly demonstrates that Sandra is unfit to care for Ivan and that she will remain unfit indefinitely. The undisputed evidence is that Sandra has suffered from several serious mental illnesses since age 12. Sandra's obvious permanent mental disability is principally the cause of the many undesirable conditions in her life that would be inconsistent with properly raising a child.

The evidence shows that Sandra has been unable and/or unwilling to maintain any employment and a permanent residence. Indeed, the record makes no reference to Sandra ever having held any type of employment. Furthermore, Sandra has failed to maintain a permanent place of abode ever since Ivan was born. In addition to her admissions to various mental hospitals, Sandra has moved from apartment to apartment, residing at each for brief periods ranging from one month to one year. The record reveals that Sandra would move, often as a result of eviction, to the next apartment, or as was later the case, to the next homeless shelter. The caseworker testified that during her visit to one apartment, she witnessed overcrowded and unsanitary living conditions. From the fall of 1992 until May of 1993, Sandra was homeless and apparently lived at two different shelters during this time. These circumstances evidence Sandra's inability to provide even the most fundamental necessities for her son.

Sandra's lifestyle also may demonstrate her inability to provide the proper guidance necessary for raising a child. Sandra is a forty-year-old woman who has given birth out of wedlock to four children by four different men.[12] Both Ivan's father and Jose R., the father of Sandra's fourth and fifth children, have criminal backgrounds and were illegal aliens before being deported. Sandra's behavior reflects a pattern of poor choices.

Finally, not only do we find that Sandra is unfit to be a parent now, we also find it extremely unlikely that she will

---

12. At the time of the Guardianship hearing, Sandra was pregnant with her fifth child. The father of this child is Jose R., who is also the father of her fourth child, but to whom Sandra is not married.

ever be fit to raise her son. Sandra has never had custody of any of her four children. She has demonstrated no efforts to pull her life together either for her own good or the good of her children. Most importantly, Sandra's problems are persistent and ongoing. They do not represent a temporary crisis or an unfortunate string of bad luck. Rather, her problems began in her teenage years and continue to this day. Her problems seem to stem, principally, from chronic schizophrenic and autistic mental disorders, conditions which repeated attempts at psychiatric treatment have been unable to cure. Although we sincerely hope that Sandra one day finds mental and emotional stability, we cannot leave Ivan in legal limbo waiting for an event that likely will never happen. F.L. § 5–313(c)(5)(iv) requires the court to consider "whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months from the time of placement. . . ." Since no amount of reunification services by the Department would likely result in reunification of Ivan and his parents, the Department need not meet its obligations under F.L. § 5–524 in order for the circuit court to terminate the natural parents' rights under F.L. § 5–313. *Cf. In re Sara K.*, 611 A.2d 71, 75 (Me.1992) (Department not required to persist in efforts at rehabilitation that can only be destined for failure).

## B

We also reverse the judgment of the circuit court on an equally important ground, namely, its finding that termination of parental rights was not necessary for Ivan to remain in the custody of his grandparents and thus achieve permanency. Specifically the judge found:

> "The Court finds that it would be contrary to the Child's best interests to be removed from the custody of the maternal grandparents. The Court further finds that continued placement of the Child with the Grandparent's [sic] does not require that the Mother's parental rights be terminated. The Child is presently in a stable environment with

his grandparents and this environment provides him with the security and sense of belonging to a family that is the goal of adoption."

Thus, the circuit court found that it was in Ivan's best interests to remain in the custody of his grandparents, but it denied the Department's petition for guardianship because it decided that it was not necessary to terminate Sandra's parental rights in order to achieve permanency for Ivan. In light of the evidence, this finding is in error.

Nowhere does F.L. Title 5 list the *necessity* of terminating parental rights as a factor in determining whether it is in the child's best interests to terminate a natural parent's rights to the child. Only termination of parental rights and a subsequent permanent placement, such as the adoption sought by the grandparents here, can provide Ivan with the permanency he needs and the Legislature has mandated. Ivan's continuation in foster care lacks the permanent legal status required by state law. He remains within the foster care system, and thereby subject to administrative review every six months. He also remains under the jurisdiction of the juvenile court, subject to periodic judicial review. This constant administrative and judicial supervision is disruptive to the lives of Ivan and his grandparents, and is the very type of uncertainty the child welfare statutes were designed to avoid. Also, as Ivan's natural guardian, Sandra has the right to visitation and the right to make educational and medical decisions on his behalf. *See* F.L. § 5–203. More importantly, while the grandparents have expressed their unequivocal desire to adopt Ivan, if they are not his legal parents, they can later decide, for whatever reason, that they are no longer in a position to care for Ivan. If this were to occur, the grandparents would simply inform the juvenile court that retains jurisdiction over Ivan that they can no longer care for him and the court would have no alternative but to place him back in the foster care system. This possible "foster care drift" is exactly what Congress and our General Assembly desire to avoid.

As discussed in Part II, *supra,* termination of parental rights is the necessary next step when reunion with the

natural parent is not possible. The statutory hierarchy of placement options is set forth in F.L. § 5–525:

(c) *Development of a permanency plan.*—In developing a permanency plan that is in the best interests of a child under foster care, the local department shall consider the following, in descending order of priority:

(1) returning the child to the child's parent or guardian, unless the department is the guardian;

(2) placing the child with relatives to whom adoption, guardianship, or care and custody, in descending order of priority, are planned to be granted;

(3) adoption in the following descending order of priority:

(i) by a current foster parent with whom the child has resided continually for at least the 12 months prior to developing the permanency plan or for a sufficient length of time to have established positive relationships and family ties; or

(ii) by another approved adoptive family;

(4) an independent living arrangement; or

(5) in exceptional situations as defined by rule or regulation, long-term foster care.

The statute is clear that when returning the child to the child's parent is not possible, placement with relatives by whom adoption is planned is the next best option. Long term foster care, on the other hand, is the least desirable option and should be considered only in exceptional circumstances as defined by rule or regulation. *See* F.L. § 5–525(c)(5). Since the adoption statutes of F.L. Subtitle 3 and the child welfare statutes of F.L. Subtitle 5 are to be read in relation to one another, F.L. § 5–304, termination of parental rights and adoption come into play when called for by the permanency plan.

No doubt the trial court's refusal to terminate Sandra's parental rights stemmed at least partly from the well-established right of a natural parent to raise his or her child. But as we discussed above, this right is not an absolute one, and is always subservient to the child's best interests.

We will not address each of the considerations listed in F.L. § 5–313(c) and (d) in order to determine whether it is in Ivan's best interest to terminate his parents' parental rights. The trial court determined that it would be in Ivan's best interest for him to remain in the grandparents' home, and this finding was supported by substantial evidence in the record. Therefore, since the provision of reunification services is excused in this case, and since Ivan needs a permanent placement, we hold that it is in the best interests of Ivan for the circuit court to terminate his natural parents' rights and grant the Petition for Guardianship with the Right to Consent to Adoption. The trial court abused its discretion in deciding otherwise.

BELL and RAKER, JJ., concur in result only.