REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 92

September Term, 2014

IN RE: ADOPTION/GUARDIANSHIP OF
QUINTLINE B. AND SHELLARIECE B.

Leahy,
Reed,
Thieme, Raymond. G., Jr.
        (Retired, Specially Assigned),
                JJ.

Opinion by Thieme, J.

Filed: September 30, 2014

On March 7, 2014, the Circuit Court for Montgomery County, sitting as a juvenile court, terminated the parental rights of Rose H. (hereinafter "mother") and Quintline B., Sr. (hereinafter "father") to their children, Quintline B., Jr. and Shellariece B., who were adjudicated children in need of assistance ("CINA"). Prior to the Termination of Parental Rights ("TPR") proceeding, on October 8, 2013, the Montgomery County Department of Health and Human Services (hereinafter "the Department") sought to change the children's permanency plan in the CINA cases from reunification to adoption by a non-relative. On October 30, 2013, the court rejected this recommended change and reaffirmed the plan of reunification in an amended order. On September 10, 2013, the Department petitioned for guardianship of the children with the right to consent to adoption. The children, through counsel, consented. Mother initially objected, but later consented to a conditional termination of her parental rights in open court, on the record, under oath, and represented by counsel. Father opposed the petition for guardianship in Notices of Objection/Request for Appointment of Attorney docketed on October 9, 2013. Father also moved to dismiss the petition on December 20, 2013. On January 7, 2014, father's motion to dismiss was denied. Following a TPR hearing on February 10, 11, and 12, 2014, the court terminated mother and father's parental rights on March 7th. Father timely appealed and presents two questions for our review, which we quote:

1.    Did the court err by allowing the Department to proceed with their Petitions to Terminate Parental Rights where the court-ordered permanency plan in the child in need of assistance case was a sole plan of reunification with the father?

2.    Did the court err in terminating the father's parental rights?

For the reasons below, we affirm the court's judgments in all respects.

## FACTS AND PROCEEDINGS

### Father's History With the Department

Father has an older son, Landon,[1] who was initially found CINA in 1999 when both of his parents were incarcerated. When Landon's mother was released, the case was closed. Landon was again found CINA in 2006 following allegations that father physically abused him. The CINA court found that Landon's mother had not cared for him in two years, that father had a history of violent behavior, that Landon was afraid of his father and unwilling to return to his care, and that father had abused cocaine in the past and refused to submit to a drug screening. Landon's permanency plan is Another Planned Permanent Living Arrangement, and his case remains open.

### The Children's CINA Proceedings

Born on October 2, 2009, Quintline tested positive for cocaine at the time of his birth and he was placed into emergency shelter care on October 5, 2009. Mother admitted using cocaine on the day she gave birth to Quintline. Quintline was found to be CINA on November 3, 2009 because both parents neglected him and were unable or unwilling to give him proper care and attention.[2]

---

[1] Landon shares a father with Quintline and Shellariece, but they do not have the same mother.

[2] Sections 3-801(f) and (g) of the Courts Article respectively define "Child in Need of Assistance" and "CINA":

(continued...)

Quintline was initially placed in foster care, pending placement with his maternal grandmother. In response to an emergency motion filed by the Department, the court found that because of "new information regarding the health of [grandmother] that adversely affect[ed] her ability to care for [Quintline]," it was detrimental to Quintline's well-being to place him with his grandmother, who also housed mother and father. On November 24, 2009, a merits hearing was held; the court continued Quintline's placement in foster care. The permanency plan of reunification with mother and father was affirmed at review hearings held on: April 9, 2010; July 2, 2010; and September 13, 2010. On March 23, 2011, the court recommended a permanency plan of reunification with father only.

Shellariece was born in 2010, placed in emergency shelter care on December 8, 2010, and found to be CINA on January 19, 2011. She was placed in the same foster care home

---

[2](...continued)

**§ 3-801.**

(a) In this subtitle the following words have the meanings indicated.
* * *
(f) "Child in Need of Assistance" means a child who requires court intervention because:
(1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and
(2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.
(g) "CINA" means a child in need of assistance.

Md. Code (1974, 2006 Repl. Vol., 2012 Supp.), § 3-801(f) of the Courts and Judicial Proceedings ("CJP") Article. *See also Dept. Of Human Res. v. Cosby*, 200 Md. App. 54, 57 n.2 (2011), *aff'd* 425 Md. 629 (2012).

as Quintline. On November 4, 2011, the court adopted the permanency plan of reunification with father.

On July 28, 2011, the first combined permanency plan review hearing was held and the court maintained a permanency plan of reunification with father for both children. The court maintained the same permanency plan at subsequent hearings held on: January 18, 2012; June 25, 2012; and December 19, 2012. At each of these hearings, the Department recommended that the permanency plan remain reunification with father.

A change, however, occurred at the permanency plan review hearing held on October 8, 2013, which had originally been scheduled for March 18, 2013. At that hearing, the Department requested that the court change the permanency plan from reunification with father to adoption by a non-relative because father's housing and employment situations were not stable, and because he had not participated in any court-ordered drug screens, nor had he made the children a priority in his life. In an order dated October 30, 2013, the court rejected the recommendation, and reaffirmed the permanency plan of reunification with father.

### Parents' Difficulties With Reunification

Mother and Quintline tested positive for cocaine on the day he was born. Mother used cocaine earlier that day.

Risa Boswell was one of the first Department social workers assigned to the children's cases. She testified that, during her time working on the case, father was bonded with the children, but significant issues needed to be resolved. In particular, she was concerned about

4

father's substance abuse, housing, and employment. In addition, she felt he needed to complete courses in parenting and the abused persons program. Initially, in 2010, father was good with the children when they visited, playing with them, feeding them, and changing their diapers. Father attended the Avery Road treatment center and was successfully discharged into an outpatient program. Upon his release from Avery Road, father became noncompliant, refusing to attend Alcoholics Anonymous and Narcotics Anonymous meetings. In addition, he failed to submit to urinalysis on a continuous basis and when random drug screens were done, he tested positive for cocaine on three different occasions. He was subsequently discharged from the outpatient program.

Father attended Avery Road again, successfully completing that program in August 2010. He then attended Second Genesis, which he successfully completed in March of 2011, and then began living at Oxford House, a sober living arrangement where he shared a house with several other men. While at Second Genesis, he received: individual, group, family, and trauma therapy; psycho-education; anger management; domestic violence prevention training; addictions treatment; relapse prevention; and coping strategies. Father completed the Responsible Father's Program in 2011. Father also completed parenting classes at the YMCA and was employed by Home Depot. Father and the children's first foster mother, Tangia Lu, sometimes had disagreements. Father got angry at Lu when she reported to Boswell that father was having problems. Lu reported that father had only used one diaper for a "couple hour" visit when she had packed several diapers for him to use, that he fed the

5

children junk food, and that he failed to feed them at all on a three-hour visit. In addition, father also sometimes failed to use car seats when picking up the children for visits. On several occasions when the Department would visit father when he was caring for the children, he did not have diapers, the children were dirty, and not appropriately dressed. In addition, after an overnight visit with father, Shellariece returned with a deep cut on her hand.

Mother lived at Avery House Halfway House for Women and Children with Shellariece while getting treatment for substance abuse. She was dismissed because of an altercation with a fellow resident. As a result, the permanency plan was changed from reunification with both parents to reunification with father.

In February 2012, the Department transferred the children's cases to social worker Tania Butler. At this time, father was only permitted weekend visitation with the children. On a Wednesday, father contacted Butler and indicated that he needed the Department to pick up the children and put them in respite care because he had had an altercation with his mother, with whom he resided, and he did not feel comfortable leaving the children in her care. This incident showed that father was keeping the children outside of his designated contact time, in violation of the CINA order.[3]

---

[3]Further investigation revealed that Ms. Lu had gone out of town without notifying the Department, and had arranged for father and paternal grandmother to watch the children.

In June 2012, Butler responded to a call about father putting Quintline in danger. The Department received a call indicating that father had held Quintline over the balcony at his home, because the child would not stop crying. Lu witnessed the incident. In response, Butler made an unannounced visit to father's home on the day of the incident. When Butler confronted father about the incident, he indicated that he was simply playing around, and that he was "just kidding." He also felt frustrated, like people were out to get him. Father became angry with Lu, because he believed she was the one who reported the incident to the Department.

In November 2012, father brought the children to spend the night with him at his girlfriend's house. On father's birthday, when the children were in his custody on an overnight visit, his girlfriend contacted him and asked him to come over to her house, which she shared with a roommate. Butler confronted father about the incident. She explained that such a visit was not authorized and that father needed to provide the names of any individuals who might spend the night with the children for their safety. Father became irritated, and indicated that it was "bullshit" that the Department should want to know his girlfriend and his girlfriend's roommate's names in order to perform background checks on them. He refused to identify them. The rule regarding background checks had been explained to father several times previously. Father indicated that the children had shared a bed that night, and that they did not sleep with him and his girlfriend.

7

Father was evicted from Oxford House in 2013 for failure to pay rent. Prior to this, the Department had attempted to provide him funds to prevent his eviction, but father could not provide proof of his employment, per Department rules. Following his eviction, father provided an address to the social worker in Landon's case who provided it to Butler. When Butler attempted to find the apartment, she could not locate the particular number given and contacted father to determine which apartment was his. Father admitted that his things were at the address he gave, but that he was homeless, living on the streets.

Father was fired from his job at Home Depot for falling asleep on the job and having an altercation with his supervisor. He worked briefly at Frederick Safe House fire protection company but failed to return to work there, providing no explanation for his actions. Father also claimed to work at Fort Detrick, but this could not be proven.

In December 2012, father stopped participating in urine screens. When Butler scheduled the tests for a more convenient day for father, he still refused to participate.

On February 1, 2013, Quintline suffered seizures while waiting for the bus at his daycare. He was taken to Shady Grove Hospital where he suffered more seizures. Quintline was transferred to Children's Hospital in Washington, DC, but father refused to meet him there to sign papers to admit him to the hospital, because he was meeting someone about the possibility of renting a room. Butler testified that it took her over an hour-and-a-half to get into contact with father during this incident. Father finally provided verbal permission for Quintline's admission into Children's Hospital.

8

Butler remained concerned that father didn't take full responsibility for his parenting duties. At the time of the TPR hearing in October 2013, father resided in a homeless shelter. Father admitted to using cocaine and alcohol in the months prior to the hearing.

**The Termination of Parental Rights Proceeding**

In July 2013, the Department requested that the CINA court change the permanency plan from reunification to adoption by a non-relative; the court denied this request and the permanency plan remained reunification with the father. On September 10, 2013, prior to the October 8, 2013 permanency plan review hearing, the Department petitioned the court for guardianship with the right to consent to adoption of the children. At the October 8, 2013 permanency plan review hearing, the CINA court reaffirmed the permanency plan of reunification with the father. Mother initially objected to the petition for guardianship, but later withdrew her objection and consented to a conditional termination of her parental rights in open court, on the record, under oath, and represented by counsel. Father opposed the petition for guardianship in Notices of Objection/Request for Appointment of Attorney docketed on October 9, 2013. On December 20, 2013, father also moved to dismiss the petition. On January 7, 2014, father's motion to dismiss was denied. Following the TPR hearing on February 10, 11, and 12, 2014, the Circuit Court for Montgomery County, sitting as a juvenile court, terminated mother and father's parental rights.

In its order terminating father's parental rights, the juvenile court made the following conclusions of law:

9

A.     The Court's charge in a Guardianship/TPR matter is to balance the welfare and best interests of a child against the fundamental liberty interest of the objecting parent.  *In re Samone H.*, 385 Md. 282, 869 A.2d 370, 381 (2005); *In re Adoption No. 10941*, 335 Md. 99, 642 A.2d 201 (1994).

B.     *In re Rashawn H.*, 402 Md. 477, 937 A.2d 177 (2007), discusses the implicit presumption that a child's best interest lies with a continuation of the parental relationship.  This presumption can only be rebutted by clear and convincing evidence that the parents are unfit, or that exceptional circumstances exist that would make a continuation of that relationship detrimental to the best interest of the child.

C.     The Court applies the clear and convincing evidentiary standard to the totality of the evidence in determining whether to grant a Guardianship/TPR petition.  In carefully considering the statutory factors set forth in Md. Code Ann., Family Law Article §5-323(d), primary consideration must be given to the health and safety of the child, although all other factors enumerated therein are to be considered as well.  The statute does not require the court to find by clear and convincing evidence that each of the factors exists, nor does it require that all of the factors be found to be applicable.  If the Court is persuaded by analysis of the applicable factors that termination serves the best interest of the child, the inapplicability of a factor will not preclude termination.  *In re Adoption of Amber R.*, 417 Md. 701, 12 A.3d 130 (2011); *In re Adoption No. 2428*, 81 Md. App. 133, 567 A.2d 139 (1989).

D.     Finally, where the health and safety of [a] child is of concern, the court may look to past conduct to predict future conduct.  *In re Nathaniel A.*, 160 Md. App. 581, 864 A.2d 1066, 1075 (2005); *In re Dustin T.*, 93 Md. App. 726, 731, 614 A.2d 999 (1992).

E.     For eight (8) years, the Department has offered services to Father for his three children under the Court's jurisdiction.  Focusing on the past four (4) years, the lives of Quintline and Shellariece, there has never been a point when the Children would have been stable and secure in his care and custody.  Quintline, Jr. and Shellariece have waited for four (4) and three (3) years respectively for Father to become a parent.  He has not.

Over the years, the Children bonded with Father and, with the Department's support, Father made progress towards reunification.  He participated in and completed inpatient drug treatment, and found stable

housing and employment. To his credit, Father consistently visited the Children. The Department, the Court, and no doubt Father, were hopeful that reunification would occur. His visits moved from supervised, to unsupervised day visits, to unsupervised weekend visits. Housing for himself and the Children appeared as the only obstacle. Then, in April, 2012, the web began to unravel.

After an incident involving his mother, the Department became aware that the Children were having unauthorized visits with Father, coordinated with the Children's first foster mother, Ms. [Lu]. Father's mother began making allegations to the Department that he was using drugs. In May, 2012, Father fell asleep at his job, had a verbal altercation with his boss, and was fired. In June, 2012, after a visit with Father, the Children were diagnosed with yeast infections because they were not being kept properly clean. Shortly thereafter, Father held Quintline, Jr. over a railing and threatened to drop him. In November, 2012, Father took the Children to an unknown person's home, which he well knew was in direct violation of a Court order. In January, 2013, Father was evicted from his housing. He was ordered to participate in urine screens and he did not comply. He admitted to using drugs. He was not truthful to the Department about most of these issues. He has left himself with no options.

The Children, by contrast, have thrived. They have made great strides and drastic improvements in their development and behavior and are in a safe and consistent place. Their foster parents have adjusted their lives to the needs of the children. Michelle T. [current foster mother] testified about the challenges of taking on the responsibility for two children, and the adjustments that are required and the compromises that have to be made. That is the role of a parent. That is the role to which Mr. B. could not accommodate.

The Children and Father are on different trajectories.

Father appeared to be close to reunifying with the Children, with the only impediment being appropriate housing for him and the Children. Clearly, in hindsight, Father had and continues to have many more issues than lack of housing. He is unable to take care of himself. He cannot provide a safe and stable [home] for his children after four (4) years of Department intervention. The Court finds that Father is not a fit parent for the Children and likely will not take the steps to become a fit parent in the foreseeable future.

The Court is aware that there are challenges ahead for the Children. However, they are best served by having real permanency. The Children have strong, loving relationships with their foster parents, Michelle T. And Ivette D. They have strong bonds with each other. The Guardianship Order will not affect those relationships.

F.     The Court has made findings of fact pursuant to the statutory factors found in §5-323(d). The Court has weighed the evidence in its entirety, including the credibility of the witnesses before it. Taking all of the above into consideration, the Court finds by clear and convincing evidence that Father is unfit, that Father poses an unacceptable risk to the Children's future safety, and that it is in the Children's best interest that the parental rights of Quintline Lamonte B. and, by consent, Rose Rebecca H., be terminated.

## DISCUSSION

### Standard of Review

We utilize the following interrelated standards of review in reviewing a court's decision to terminate the rights of a parent:

> Namely, [w]hen the appellate court scrutinizes factual findings, the clearly erroneous standard of [Rule 8–131(c) ] applies. [Second,] [i]f it appears that the [court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [court's] decision should be disturbed only if there has been a clear abuse of discretion.

*In re Adoption/Guardianship of Jasmine D.*, 217 Md. App. 718, 733, 94 A.3d 837, 846-47 (2014) (quoting *In re Adriana T.*, 208 Md. App. 545, 553–54 (2012)).

### I.

Father asserts that the court erred when it permitted the Department to proceed with termination of his parental rights where the permanency plan in the children's CINA cases

12

remained reunification with him. He contends that his due process rights were violated in two ways. First, because of the TPR, the Department and not the Court, in effect, changed the permanency plan in the children's CINA case. Second, issues pending in the CINA litigation were foreclosed upon by the granting of the TPR without an opportunity for further review. In addition, father contends that interpreting *In re Adoption/Guardianship of Jayden G.*, 433 Md. 50 (2013) (hereinafter "*Jayden G.*") to require a TPR petition to be heard when the permanency plan is reunification also violates his due process rights. The Department counters that there are three ways to initiate a TPR proceeding: 1) when a Department determines that adoption is in the child's best interests, they must file a TPR within 60 days; 2) the Department shall file a TPR if a child has been in an out-of-home placement for 15 of the most recent 22 months; and 3) when a CINA court changes a permanency plan to adoption. Because of this, the Department argues, the change of permanency plan in a CINA case is not necessarily a condition precedent to the filing of a TPR. The children echo the Department's argument.

The above-mentioned case, *Jayden G.*, 433 Md. 50 (2013), is instructive. In *Jayden G.*, the Court of Appeals decided whether a TPR proceeding should have been stayed pending the resolution of an appeal of a change in permanency plan from reunification to adoption by a non-relative. *Id*. at 66. In that case, the CINA court changed the permanency plan from reunification to adoption by a non-relative. The mother appealed. *Id*. at 53. Pending the appeal, the Department filed a TPR petition. *Id*. Mother moved to stay

proceedings in the TPR case pending the resolution of her appeal on the change of permanency plan. *Id*. The juvenile court granted the TPR petition, which mother also appealed. *Id*. In the first appeal, we vacated the change in permanency plan and remanded for further proceedings. *Id*. In the second appeal, we affirmed the termination of mother's parental rights. *Id*. at 65. Mother appealed this decision to the Court of Appeals.

In its opinion, the Court of Appeals noted that "[t]he role of parents in caring for their children is 'established beyond debate as an enduring American tradition,'" and that there is "a presumption of law and fact - that it is in the best interest of children to remain in the care and custody of their parents." *Id*. at 66-67 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 495 (2007) (hereinafter "*Rashawn H.*")). That presumption, however, may be rebutted by "experience and reality." *Jayden G.*, 433 Md. at 67 (quoting *Parham v. J.R.*, 442 U.S. 584, 602 (1979)). The Court also noted that "in contested adoption and TPR cases ..., where the fundamental right of parents to raise their children stands in the starkest contrast to the State's effort to protect those children from unacceptable neglect or abuse, the best interest of the child remains the ultimate governing standard." *Id*. at 68 (quoting *Rashawn H.*, 402 Md. at 496).

In *Jayden G.*, the mother sought a blanket rule requiring a stay in TPR proceedings where an appeal of the change of permanency plan is pending. *Id*. The Court held that a parent does have the right to appeal a change of permanency plan, but that right is not absolute and is limited by the sound discretion of the court, taking into account the best

14

interests of the child in a given case. *Id*. at 69. A parent may appeal an interlocutory order pursuant to Maryland Code (1974, 2013 Repl. Vol.) Courts and Judicial Proceedings (CJP) Article, Section 12-303(3)(x), where that order "[d]epriv[ed] a parent, grandparent, or natural guardian of the care and custody of his child, or chang[ed] the terms of such an order[.]" The Court noted that there is a difference between "[p]rohibited action by the trial court that defeats the right of a party to prosecute an appeal" and that "permitted action by the trial court that renders a case moot." *Jayden G*. 433 Md. at 74 (quoting *In re Deontay J.*, 408 Md. 152, 163 (2009)). In addition, "[a]lthough 'a CINA adjudication must precede a TPR determination, it is a separate legal proceeding.'" *Id*. at 75 (quoting *In re Adoption/Guardianship of Cross H.*, 200 Md. App. 142, 150 (2011)).

In drawing a distinction between a CINA and a TPR proceeding, the Court noted that the statutes governing both proceedings are governed by two distinct portions of the Code: the Courts and Judicial Proceedings (CJP) Article governs CINA proceedings; and the Family Law (FL) Article governs TPR proceedings. *Id*. The court also noted that the evidentiary burden in CINA cases is "preponderance of the evidence," while "clear and convincing" evidence is required in TPR cases. *Id*. at 77. Moreover, strict adherence to the Maryland Rules of Evidence is not required in a permanency plan hearing, while it is required in a TPR proceeding. *Id*.

Of greatest relevance to this case, *Jayden G.* discusses the ways TPR proceedings are initiated. The Court enumerates three ways in which a TPR case may be commenced. *Id*.

15

at 78.

First, under CJP § 3-823(g), the Department is required to file a TPR petition after a juvenile court finds a permanency plan of adoption by a non-relative is in the best interest of the child. That section provides:

> (g) In the case of a child for whom the court determines that the plan should be changed to adoption under subsection (e)(1)(i)3 of this section, the court shall:
>
> > (1) Order the local department to file a petition for guardianship in accordance with Title 5, Subtitle 3 of the Family Law Article within 30 days or, if the local department does not support the plan, within 60 days; and
> >
> > (2) Schedule a TPR hearing instead of the next 6-month review hearing.

Second, the Department must file a TPR petition when a child has been in an out-of-home placement for 15 of the most recent 22 months, according to FL § 5-525.1(b), which holds:

> (b)(1) Except as provided in paragraph (3) of this subsection, a local department to which a child is committed under § 5-525 of this subtitle shall file a petition for termination of parental rights or join a termination of parental rights action that has been filed if:
>
> > (i) the child has been in an out-of-home placement for 15 of the most recent 22 months[.]

Maryland Code (1984, 2012 Repl. Vol.) Family Law (FL) Article § 5-525.1(b).

Finally, according to FL § 5-525.1(a), a child placement agency must file a TPR petition if it determines that adoption is in the best interests of the child. It reads:

16

(a) If a child placement agency to which a child is committed under § 5-525 of this subtitle determines that adoption of the child is in the best interest of the child, the child placement agency shall refer the case to the agency attorney within 60 days of the determination and the agency attorney shall file a petition for termination of the natural parent's rights with the court within 60 days of receipt of the referral.

The existence of three different avenues to file a TPR petition clearly indicate that the Legislature did not intend that a change in permanency plan be the sole means by which to sever a parent's rights. Therefore, it must also be assumed that the Legislature contemplated situations in which a parent would not have the benefit of appealing a change in permanency plan prior to the initiation of a TPR proceeding.

We recall father's contention that permitting the Department to proceed with a TPR case without a change in permanency plan violates his due process rights. We disagree. Here, both FL § 5-525.1(a) and FL 5-525.1(b) contemplate independent action on the Department's or child placement agency's part on behalf of the best interests of the child. Neither statute requires a change in permanency plan as a condition precedent to the filing of a TPR. Furthermore, a parent's right to appeal an interlocutory order changing the permanency plan to adoption must always be balanced against the best interests of the child. *See Jayden G.*, 433 Md. at 72 (holding that although there is a right to appeal a change in permanency plan, that right is not absolute and does not require the stay of a TPR proceeding). The best interests of the child is the transcendent principle in both CINA and TPR proceedings.

17

Nonetheless, our case law has been clear and consistent, that, even in contested adoption and TPR cases (and in permanency plan proceedings that may inevitably lead to a TPR case), where the fundamental right of parents to raise their children stands in the starkest contrast to the State's effort to protect those children from unacceptable neglect or abuse, the best interest of the child remains the ultimate governing standard.

*Rashawn H.*, 402 Md. at 496. Considering the facts of the present case, we are persuaded that the Department believed it was acting in the children's best interests when it filed the TPR petition. Any deprivation of interlocutory judicial review because the Department proceeded with the TPR in a manner other than through a change in permanency plan is incidental. The law permits the Department to file a TPR when the permanency plan is not adoption by a non-relative. Father's right to raise the children must always be balanced against the children's best interests. We echo the Court of Appeals in holding:

the parent has a right to appeal the plan changing the permanency plan from reunification to adoption, but that right does not foreclose or forestall the pursuit of other, overlapping statutory processes. It must coexist with the statutory provisions encouraging expediency in the resolution of TPR cases and the child's paramount need for permanency, which underlies our CINA and TPR statutes.

*Jayden G.*, 433 Md. at 72. The juvenile court was permitted to act upon the TPR petition, as evidenced by the Court of Appeals holding in *Jayden G.* and by FL § 5-525.1(a) and FL 5-525.1(b). Accordingly, this case is among those where "permitted action by the trial court . . . render[ed] a case moot." *Id.* at 74 (quoting *In re Deontay J.*, 408 Md. at 163).

Father's assertion that his due process rights would be violated, if we were to hold that *Jayden G.* requires a court to hear a TPR petition when the permanency plan is reunification,

18

is erroneous. In *Jayden G*., the Court of Appeals held that a juvenile court *may* hear a TPR petition while the permanency plan remains reunification. The Court explained:

> Our rejection, on the one hand, of the Mother's argument that the juvenile court had to stay the TPR proceedings and, on the other hand, the Department's argument that the juvenile court was required to deny the motion, brings us to the conclusion that the juvenile court was **not required** to rule in any particular way. Rather, as in many other contexts, the decision of whether to grant the Mother's motion to stay was within the court's discretion.

*Id*. at 82 (emphasis in original). Our holding here goes no further than did the Court of Appeals in *Jayden G*. Simply put, it was within the juvenile court's sound discretion to consider or refuse to consider the TPR petition, notwithstanding a permanency plan remaining reunification, and father's due process rights were not violated. *See id*. at 69 (holding that a parent's right to appeal the change of permanency plan is limited by the sound discretion of the court, taking into account the best interests of the child).

## II.

Father's second contention is that the TPR court erred in terminating his parental rights. He asserts that he worked diligently toward reunification, and had only suffered recent setbacks. The Department counters that there was clear and convincing evidence that terminating father's parental rights was in the children's best interests. The children agree that the court properly terminated father's parental rights.

In order to terminate a parent's parental rights, the State must prove by clear and convincing evidence that such a termination was in the child's best interests. *In re Priscilla*

19

*B.*, 214 Md. App. 600, 622 (2013). As we noted above, the parents' role in raising their children is "established beyond debate as an enduring American tradition," and that there is "a presumption of law and fact - that it is in the best interest of children to remain in the care and custody of their parents." *Jayden G.* 433 Md. at 66-67 (quoting *Yoder*, 406 U.S. at 232; *Rashawn H.*, 402 Md. at 495). This presumption, however, may be "rebutted only by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest." *Rashawn H.*, 402 Md. at 498. "[I]n contested adoption and TPR cases ..., where the fundamental right of parents to raise their children stands in the starkest contrast to the State's effort to protect those children from unacceptable neglect or abuse, the best interest of the child remains the ultimate governing standard." *Jayden G.*, 433 Md. at 68 (quoting *Rashawn H.*, 402 Md. at 496). In deciding whether to terminate a parent's rights, courts are required to consider factors enumerated in FL § 5-323(d), which provides:

> Except as provided in subsection (c) of this section, in ruling on a petition for guardianship of a child, a juvenile court shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests, including:
>
>> (1)(i) all services offered to the parent before the child's placement, whether offered by a local department, another agency, or a professional;
>>
>>> (ii) the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent; and

20

(iii) the extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any;

(2) the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home, including:

(i) the extent to which the parent has maintained regular contact with:

1. the child;

2. the local department to which the child is committed; and

3. if feasible, the child's caregiver;

(ii) the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so;

(iii) the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and ongoing physical or psychological needs for long periods of time; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement unless the juvenile court makes a specific finding that it is in the child's best interests to extend the time for a specified period

(3) whether:

> (i) the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect;

> (ii) 1. A. on admission to a hospital for the child's delivery, the mother tested positive for a drug as evidenced by a positive toxicology test; or

>> B. upon the birth of the child, the child tested positive for a drug as evidenced by a positive toxicology test; and

> 2. the mother refused the level of drug treatment recommended by a qualified addictions specialist, as defined in § 5-1201 of this title, or by a physician or psychologist, as defined in the Health Occupations Article;

> (iii) the parent subjected the child to:

>> 1. chronic abuse;

>> 2. chronic and life-threatening neglect;

>> 3. sexual abuse; or

>> 4. torture;

> (iv) the parent has been convicted, in any state or any court of the United States, of:

>> 1. a crime of violence against:

>>> A. a minor offspring of the parent;

>>> B. the child; or

22

> C. another parent of
> the child; or
>
> 2. aiding or abetting, conspiring, or
> soliciting to commit a crime
> described in item 1 of this item; and
>
> (v) the parent has involuntarily lost parental rights
> to a sibling of the child; and
>
> (4)(i) the child's emotional ties with and feelings toward the
> child's parents, the child's siblings, and others who may affect
> the child's best interests significantly;
>
> (ii) the child's adjustment to:
>
> 1. community;
>
> 2. home;
>
> 3. placement; and
>
> 4. school;
>
> (iii) the child's feelings about severance of the
> parent-child relationship; and
>
> (iv) the likely impact of terminating parental
> rights on the child's well-being.

The juvenile court's written order considered each of the factors listed above. We find several of the court's findings of fact particularly persuasive. Appellant has received services from the Department from the initiation of Landon's CINA case, which began in 1999. Though father has successfully completed drug and alcohol rehabilitation programs at Avery Road and Second Genesis, substance abuse still remains a major concern. He has

23

evaded drug screens, and admitted to drinking and doing drugs in the months prior to the TPR hearing. Though father completed parenting courses, he still failed to inspire confidence as a caretaker, failing to feed the children on occasion and not taking responsibility to provide diapers, wipes, and snacks for the children during visits. This indicated an expectation that others would provide for the children, when it was his responsibility to do so. We find the incident where father held Quintline over a second-floor railing particularly troubling. It indicates a lack of judgment, as well as a flippant attitude toward the seriousness of his family's situation. This out-of-touch attitude again manifested itself when father failed to accompany his son to Children's Hospital in Washington to sign admission papers after Quintline suffered seizures. Rather, father preferred to meet with a man about renting a room.

Housing has also been a major struggle and area of concern for father. Over the span of this case, father has shown himself to be itinerant. Such an existence is not in the best interests of the children. Furthermore, at the time of the TPR hearing, father resided in a homeless shelter.

Father has also failed to hold down a steady job. He has been fired from Home Depot for sleeping on the job, was employed by a fire safety company for a short time, and may have temporarily worked at Fort Detrick.

The TPR court found, and we agree, that the quality of father's visits with the children is an issue, not the quantity. Quintline was in care for 52 months and Shellariece for 38

24

months at the time father's parental rights were terminated. Father's position now is actually worse than it was when the children were put into care. He remains unemployed, abuses drugs and alcohol, and is now homeless, where he was not before.

The children are strongly bonded to one another and their new foster parents, Michelle T. and Ivette D. They are also bonded to father, and it is difficult to determine how they might react to the severance of their relationship with him. The children are adjusting well and thriving at school. The foster parents provide good structure, which is especially helpful to Quintline. Furthermore, father even indicated that the ideal situation would be for the foster parents to adopt the children and for him to have liberal visitation with them.

The TPR court made the specific finding that it would not be in the children's best interests to extend the foster period. We agree. For all the reasons discussed above, we are persuaded that the Department demonstrated by clear and convincing evidence, that termination of the parent-child relationship is in the best interests of the children. We affirm.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY, SITTING AS A JUVENILE COURT, AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

25