*IN RE: H.R., E.R., J.R.*,   No. 1742, September Term, 2017

**TERMINATION OF PARENTAL RIGHTS PROCEEDING — EVIDENCE — RULE 5-803(b)(8)(A) & (B) — PUBLIC RECORDS EXCEPTION TO THE RULE AGAINST HEARSAY —- JUDICIAL NOTICE.**

In a termination of parental rights ("TPR") proceeding, the juvenile court did not err by admitting into evidence several reports made by the local department of social services to the juvenile court prior to and for the court's use in CINA permanency planning hearings for the children who were the subjects of the TPR.  The reports were hearsay but were admissible under Rule 5-803(b)(8), the public records exception to the rule against hearsay.  Specifically, the reports were made by a public agency and set forth matters observed pursuant to a duty imposed by law as to which there was a duty to report. Md. Rule 5-803(b)(8)(A). Father, who was opposing the termination of his parental rights, did not satisfy the burden, under Rule 5-803(b)(8)(B), to show that the reports or the information they conveyed were untrustworthy. To the extent the reports did not merely include facts but also included opinions, there was no error in admitting them because the experts whose opinions were conveyed were present at the hearing and available for cross-examination.

In addition, the juvenile court did not err by taking judicial notice of facts alleged in the amended CINA petition, to which Father had specifically stipulated.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1742

September Term, 2017

_____

IN RE: H.R., E.R. & J.R.

_____

Eyler, Deborah S.,
Kehoe,
Beachley,

JJ.
_____

Opinion by Eyler, Deborah S., J.
_____

Filed:  August 29, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

On November 3, 2017, the Circuit Court for Montgomery County, sitting as a juvenile court, entered orders granting petitions filed by the Montgomery County Department of Social Services ("the Department"), an appellee, to terminate the parental rights of Mr. R. ("Father"), the appellant, in H.R., E.R., and J.R., also appellees.[1] The children's mother, Ms. C. ("Mother"), consented to the termination of her parental rights. At the time of the proceedings, H. was 6 years old, E. was 5 years old, and J. was 3 years old. Two older children, R.R., age 10, and Y.R., age 9, are not involved in this appeal.

Father presents three questions, which we have combined and rephrased as two:

I. Did the juvenile court err by taking judicial notice of and/or by admitting as public records materials from the children's CINA files and materials related to Father's criminal cases during the contested TPR hearing?

II. Did the circuit court err or abuse its discretion by finding that Father was unfit to maintain a parental relationship with the children?

For the following reasons, we shall affirm the orders of the juvenile court.

## FACTS AND PROCEEDINGS

Father and Mother have five sons together.[2] They have never been married. The children lived together with Father and Mother from birth through February 2015, except for a brief period in 2014 when they lived with relatives in Ohio.

The Department's involvement with Father and Mother began in July 2014. At that time, Father, Mother, and the children were living in an apartment on Piney Branch Road in Silver Spring. On July 25, 2014, the Department received a report of neglect

---

[1] For ease of discussion, we shall refer to the children by their first initials only.

[2] Mother also has two children from another relationship.

after Father and Mother both were arrested and charged with first- and second-degree assault, and distribution of and conspiracy to distribute controlled dangerous substances ("CDS"). Father also was charged with a fourth-degree sexual offense. The charges stemmed from allegations made by two 16-year-old girls who Father and Mother hired to babysit the children. According to the girls, in their presence, Mother performed fellatio on Father multiple times; Father and Mother gave them Adderall; Father forcibly kissed one of the girls and placed her hand on his penis; and Mother physically assaulted one of the girls.

While Father and Mother were in pre-trial detention, the children's maternal aunt took them to Ohio, where Father also had relatives. A social worker with the Department asked the local department in Ohio to assess the children's safety. The Ohio department reported that the relative placement was suitable in the short-term.

On July 30, 2014, a Department social worker went to the Montgomery County Detention Center to meet with Father and Mother. They declined to meet with her.

On August 7, 2014, Father and Mother both were released on bond pending trial. The children remained in Ohio.

A week later, the Department received a report that Father might be "barricaded in his apartment threatening to 'blow it up.'" Father received inpatient psychiatric care for four days following that incident.

Father contacted the Department in early September 2014, advised that he had spent time in the hospital, and informed a social worker that he wanted to retrieve his

children from his family in Ohio but that a condition of his bond was that he not leave Maryland.

Ultimately, Father was able to modify his bond conditions to permit him to go to Ohio and, by October 2, 2014, he had retrieved the children and was again living with them in the Silver Spring apartment. On that day, the Department received a report of unsafe home conditions. The reporter stated that Father was entering the apartment by climbing up a balcony because the door to the apartment was off its hinges and impassible. The conditions inside the apartment were "disgusting," "squalor," and "torn apart." Father and Mother fled with the children when the reporter advised that he or she was calling the Department.

From November 2014 to February 2015, Mary Shine, an in-home services supervisor for the Department's Child Welfare Services ("CWS") division, was assigned to the children's case. During that time, the Department provided family preservation services to Father and Mother, including gift cards for groceries and gasoline. Father, Mother, and the children sometimes stayed at the apartment and sometimes stayed in hotels. Father and Mother acknowledged that the condition of the apartment was terrible but told Ms. Shine that it had been damaged when the police broke down the door to arrest them in July 2014, and again when the SWAT team entered the apartment in August 2014 because Father was threatening to blow it up. Father described the apartment looking like "Hurricane Katrina went through it."

During home visits, Ms. Shine observed messy, dirty conditions in the apartment and very little food for the children. The children appeared "bonded" with their parents.

Ms. Shine was concerned about both parents' mental health issues and about their pending criminal charges. Father and Mother did not have any plans for the children in the event they were convicted, but Father was adamant that the children not be returned to family members in Ohio.[3]

In January 2015, Father and Mother canceled four home visits. When Ms. Shine arrived for a scheduled home visit on January 28, 2015, no one was home. She waited until, eventually, Father arrived at the apartment. Father told Ms. Shine that Mother was at the hospital with H., E., and J., and that she was "losing it" because she had stopped taking her psychotropic medications. Father agreed to enter into a "Voluntary Placement Agreement" for the children to be sheltered, but then did not show up to a February 2, 2015 meeting to execute that agreement.

On February 3, 2015, the children were removed from the home and placed in shelter care. On that day, Ms. Shine went to the apartment because the older children had missed two days of school in a row. Mother answered the door, but refused to let Ms. Shine in. She said she would get the children and open the door in a moment, but then did not do so. A pizza delivery person arrived at the house and Mother opened the door for him, but still refused entry to Ms. Shine. After ten minutes passed, Ms. Shine called the police. Father and Mother opened the door after the police arrived. The home was littered with trash and clothing.

---

[3] Both Father and Mother had relatives in Ohio. Father told Ms. Shine that the children had witnessed domestic violence during their stay in Ohio in 2014.

On February 4, 2015, the Department filed petitions in the juvenile court to adjudicate H., E., and J. children in need of assistance ("CINA").[4] At that time, H. was 4 years old, E. was 2 years old, and J. was 11 months old. H. and E. were placed together in an agency foster home, where they have remained throughout the instant proceedings. J. was placed in another foster home, where he also has remained.[5]

On February 25, 2015, Father and Mother each were convicted following jury trials of two counts of distribution of CDS and one count of conspiracy to distribute. Father also was convicted of one count of fourth degree sexual offense. On March 9, 2015, Father was sentenced to two terms of five years' incarceration on each of the CDS counts and one year for the fourth-degree sexual offense, all to be served concurrently. All but three years of that sentence was suspended in favor of a term of five years' supervised probation. Mother later was sentenced to a term of incarceration as well, but it was suspended in favor of probation.

On March 11, 2015, Father and Mother stipulated to all the facts alleged in the Department's amended CINA petitions. The court found based upon those facts (most of which were recounted, *supra*) that the children were CINA and committed them to the custody of the Department, with a permanency plan for reunification. The court ordered

---

[4] A child in need of assistance is "a child who requires court intervention because: (1)[t]he child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2)[t]he child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." Md. Code (1973, 2013 Repl. Vol.), § 3-801(f) of the Courts & Judicial Proceedings Article.

[5] The children's two maternal half-siblings also are placed in the home with J.

that Father would not be permitted in-person visits with the children at his correctional facility until further order of the court.

Around that time, Lori Weinstein, a social worker in the CWS division, was assigned to J.'s case and to be Father's assigned parent worker. Latashia Morton-Warren, another CWS social worker, was assigned to H.'s and E.'s cases.

Father was incarcerated for two years and three months. He spent most of that time at Roxbury Correctional Institute ("RCI"), in Hagerstown, although he briefly was incarcerated at the Maryland Correctional Training Center ("MCTC"), also in Hagerstown, and spent over four months at the Patuxent Institution, in Jessup, receiving intensive psychiatric care. During the first year of Father's incarceration, he was permitted telephone and written communication with the children, per the juvenile court's order. He moved to revise the restriction on visitation and, by order entered March 7, 2016, the juvenile court granted Father permission to have once monthly visits with the children. Initially, the juvenile court ordered that the three younger children visit with Father together and the two older children have a separate visit. On July 6, 2016, that requirement was removed, and all five children met with Father together for a monthly visit. Father successfully moved to modify visitation to return to the separate monthly visits. An order to that effect was entered on July 22, 2016.

On May 8, 2017, the Department filed petitions for guardianship and to terminate Father's (and Mother's) parental rights. Father timely filed an opposition to the petitions. Mother filed a consent to the termination of her parental rights.

On June 19, 2017, Father was released from prison. Around the same time, Brooke Hinkle, a CWS social worker, took over for Ms. Weinstein, becoming J.'s caseworker and the caseworker for Father (and Mother).

On July 31, 2017, and August 11, 2017, Father was evaluated by Alex Rodrigues, Ph.D., a psychologist, at the Department's request. Father refused to sign a release to permit Dr. Rodrigues to speak to his current and former treatment providers. As we shall discuss in more detail, *infra*, Dr. Rodrigues diagnosed Father with bipolar disorder with psychosis. He later added a provisional diagnosis of anti-social personality disorder ("ASPD").

On October 13, 2017, the juvenile court held a permanency planning review hearing and granted the Department's request to change J.'s plan to adoption by a non-relative, *i.e.*, his current foster mother, and to change H.'s and E.'s plans to custody and guardianship.[6] Father appealed from those orders, but that appeal has been stayed pending the outcome of the instant appeal.

A contested TPR hearing went forward on October 16, 17, 18, and 20, 2017. In its case, the Department called five witnesses: Dr. Rodrigues; Ms. Hinkle; Ms. Morton-Warren; Timothy Cox, a social worker at RCI; and Angela M., J.'s foster mother. It introduced into evidence the *de bene esse* deposition of Ms. Weinstein.

Dr. Rodrigues was accepted as an expert in forensic psychology. He testified that his evaluation of Father was based upon a clinical interview, a review of behavioral

---

[6] H. and E. are not in a pre-adoptive placement, although the foster parents have not ruled out becoming an adoptive resource for them.

observations, and psychological testing. Ordinarily he would have spoken to past and current treatment providers and reviewed past treatment records, but Father declined to sign releases to permit him to do so. Based upon his evaluation, Dr. Rodrigues diagnosed Father with "other specified bipolar disorder." That condition is characterized by "oscillating moods," primarily mania and depression. Dr. Rodrigues opined that Father met all the directly observable criteria for bipolar disorder: irritability, grandiosity, pressured speech, and tangential speech, but that "[t]here was the need for one additional criteri[on] to be met . . . [to make a] full diagnosis." The other possible criteria, which were not directly observable during the evaluation, included "impulsivity in life, promiscuous behavior in . . . regards to sexual behavior, potential drug use."

Dr. Rodrigues opined as to each of the criteria that were met. Grandiosity is the tendency to inflate one's self-image in "impractical" ways. As an example, Father told Dr. Rodrigues that he expected to become a paralegal, despite not having graduated from high school. Father's psychological testing also revealed "an elevation on the grandiosity scale." Father displayed pressured speech, which Dr. Rodrigues characterized as "like machine[ gun] fire . . . . speaking at a very high speed," as well as tangential speech, which involves the inability to stay on topic. Dr. Rodrigues noted that on several occasions during the clinical interview, he had to "redirect" Father "back to the item or question I had specifically asked." Finally, Father displayed irritability "towards a great number of people."

Dr. Rodrigues found Father to be an unreliable reporter. He explained that he uses a two-step process to determine reliability. First, he "look[s] at the information provided

in the self-report" to gauge if the responses are "straightforward," "logical," and "possible." Second, if he finds the responses to be unreliable, he considers the "motivation behind them being unreliable." Dr. Rodrigues "found [Father] to be unreliable based on three different elements." First, his psychological testing showed "defensive[ness]." Second, his self-report of his arrest history was inconsistent with the history available to Dr. Rodrigues on the *Maryland Judiciary Case Search* database. Third, Father told "very convoluted" stories in which he "externaliz[ed] or place[d] blame on people outside of himself."

Dr. Rodrigues opined that "[l]ack of insight or . . . awareness of your psychiatric illness" is a "common feature" in those with bipolar disorder and Father displayed "limited insight." He told Dr. Rodrigues that he was taking Celexa, an anti-depressant, and Lithium, a drug used to treat bipolar disorder, but believed he would not need to continue taking these medications in the future. This was "particularly concerning" to Dr. Rodrigues. Father also continued to exhibit "symptomology" of bipolar disorder, leading Dr. Rodrigues to question whether Father was consistent with his medication or whether his dose was appropriate.

In Dr. Rodrigues's view, Father would have difficulty "absorb[ing] any information" if he were manic, because irritability and grandiosity both would be high. Thus, if Father's bipolar disorder was untreated, it could be a "potential barrier" to his ability to "adapt or correct his behaviors."

After Dr. Rodrigues completed his evaluation of Father, he had the opportunity to review "two to three additional pieces of collateral documents" supplied to him by the

Department.  First, he reviewed a "functional report" completed by Father while he was incarcerated, in which Father self-reported that in addition to Celexa and Lithium, he also was prescribed Risperdal, an anti-psychotic, and that he feared being "set up, persecute[d], dying, com[ing] back to life."  That document led Dr. Rodrigues to amend his diagnosis of Father to bipolar disorder with psychosis, or "a disconnect [with] reality," which was not evident from the clinical evaluation.

Dr. Rodrigues also had reviewed the sentencing memorandum prepared by the State's Attorney's Office in Father's 2014 criminal case,[7] as well as Father's deposition testimony.  Those documents revealed a "much more extensive criminal history" than Father had disclosed during his evaluation.  Father had disclosed his recent criminal convictions, for which he had been incarcerated, and a prior weapons possession charge.  He did not report his criminal history as an adult and as a juvenile in Ohio and Washington, D.C.  That history (and Father's omission of it during the evaluation) led Dr. Rodrigues to consider a "provisional diagnosis" of ASPD, which is a "long enduring personal disposition that shows a disregard for the norms of society as well as the rights and wishes of others."  Had Dr. Rodrigues been aware of that history during Father's evaluation, he would have pursued additional lines of questioning.

Angela M. testified that she had been J.'s foster mom since February 2015.  She also was fostering J.'s maternal half-sister and maternal half-brother.  When J. entered Angela M.'s care, he was "wounded."  He suffered from hydrocephalus, causing his head

---

[7] As we shall discuss, *infra*, Father's counsel objected to the admission of this document into evidence.

to be extremely large for his age. He was eleven months old but could not crawl and could "barely hold his bottle." He showed very little emotion. When he cried, he shed tears but made no sound. By age three, however, he was developmentally normal. He was "smart as a whip" and was able to swim. Angela M. testified that she was willing and able to be an adoptive resource for J.

Ms. Morton-Warren was accepted as an expert in the field of social work, safety, and risk. In April 2016, she was assigned to H.'s and E.'s cases. She had been supervising visits between Father, H., and E. since that time. She observed that Father was inconsistent in his ability to set appropriate limits for the children and engage with them. E. often acted out during visits and, while Father initially would correct him, he (Father) often ignored the inappropriate behavior if E. resumed it. H. often did not want to attend visits with Father. It sometimes took Ms. Morton-Warren forty minutes to convince H. to attend visits, and other times visits with H. were cancelled.

Ms. Morton-Warren opined that H. and E. "care about their dad[,]" but that they have a "mix of emotions." They did not seek him out for "security." They are extremely bonded to each other and to their other siblings, however.

H. and E. both had adjusted well to their foster placement. The home was highly structured, which was healthy for the boys. The foster family was very involved in the children's school and were able to attend meetings whenever the boys had problems. H. and E. were strongly bonded to their foster parents.

The permanency plan for H. and E. was custody and guardianship. If Father's parental rights were terminated and the foster parents were not willing to be an adoptive

resource for H. and E., the Department would conduct recruitment efforts for a permanent placement. The Department could use many additional adoptive resources after termination that were unavailable pre-termination.

Ms. Morton-Warren opined that the children would not be safe if they were returned to Father's custody because of his serious criminal history and his failure to "come to terms" with his need for services.

Ms. Hinkle, a licensed graduate social worker, was accepted by the court as an expert in social work. In August 2017, she was assigned to be the child worker for J. (and the two older children not involved in this appeal) and to serve as the parent worker for Father. In the latter capacity, she was supposed to have weekly communication with Father. There were times, however, when she could not reach him by phone or text message. Ms. Hinkle obtained Father's email address to facilitate regular communication. She explained that Father often was not prompt in responding to email communications, despite having advised her that that was his preferred method of contact.

Ms. Hinkle testified about a June 2017 service agreement between Father and the Department.[8] Father did not return the signed service agreement to the Department for several weeks after it was presented to him. He also made "handwritten additions" to the service agreement. For example, the service agreement required Father to attend substance abuse counseling and anger management classes. Father handwrote on the

_____

[8] Ms. Hinkle was not assigned to Father's case in June 2017, but she was "shadowing" Ms. Weinstein at that time, in anticipation of taking over the case.

front page of the service agreement that he did not "have a substance abuse problem or anger control problems." He also wrote "unnecessary" next to the section requiring him to take anger management classes. Next to a section requiring him to participate in parenting classes, he wrote that he already had completed and graduated from a "father's program."

One requirement of the service agreement was that Father obtain suitable housing. He had been homeless and living in shelters since his release from prison. The Department attempted to assist Father to find housing, but due to his status as a registered sex offender, they were unsuccessful. Father advised the Department that he was saving up money to find housing and that he might be able to move in with his sister but had provided no documentation of those efforts.

Father also was required to find employment. He told the Department he was doing landscaping jobs, but he had not provided any documentation of employment or any attempts to find employment. His only source of income, as far as Ms. Hinkle knew, was social security disability benefits. He had not provided documentation of that income, however.

Father was required to meet with his parole officer and follow all her recommendations. Father refused to sign a release to permit Ms. Hinkle to receive copies of his parole officer's records. In email correspondence with Father's parole officer, Ms. Hinkle learned that Father was required to meet with his parole officer once weekly, on Tuesday or, if he missed that meeting, on Thursday. He was not required to submit to urinalysis.

As part of the service agreement, the Department asked Father to sign releases to permit them to communicate with his various healthcare service providers. Father was unwilling to sign releases to permit the Department to speak to his psychiatrist, Bruce Tanenbaum, M.D.; to RCI, MCTC, and Patuxent officials about mental health services he received while in prison; or, as mentioned, to his parole officer. Ms. Hinkle testified that the releases would have been helpful to the Department in "assessing what's going to be potentially a safe placement for [the children]." She elaborated that it was difficult for her to "make a full assessment to say that the children [would] be safe returning to [Father] if [she didn't] have all th[e] information [about his criminal history and his mental health]."

The Department referred Father for random urinalysis in August 2017. There were numerous problems with scheduling the testing, however, some caused by Father and some caused by the testing center. When Father's deposition was taken in this case, Ms. Hinkle asked him to go directly for urinalysis testing, which was at a facility across the street from where he was deposed. Despite knowing that he needed to provide urine for testing, Father used the restroom at the deposition location and then was unable to produce urine for testing. On a later date, also after a deposition, Father was able to provide a urine sample. The results showed that he tested positive for amphetamines. Father told Ms. Hinkle he had been prescribed Adderall. Because Father had not signed a

release for information from Dr. Tanenbaum, however, the Department could not determine whether this test result reflected prescribed drugs or illicit drug use.[9]

Father did not comply with the Department's directive that he participate in anger management classes and parenting classes. He had agreed to work with a parenting coach during visits with the children. The parenting coach selected by the Department required Father to meet with her for at least one individual session prior to attending a visitation session, however. Ms. Hinkle gave Father at least two weeks' notice of that individual session, but Father cancelled the appointment on the day of the session because he said he had a landscaping job and a meeting with his attorney that day. The parenting coach had offered to accommodate Father on a weekend day if that worked better for him, but he had yet to reschedule the appointment.

Father also was not receiving individual therapy, as required by the service agreement. Dr. Tanenbaum had made a referral for Father, but he had not commenced treatment. He also had not provided the Department with any documentation that he was participating in psychiatric medication management, another requirement under the service agreement.

In her role as J.'s child worker, Ms. Hinkle monitored his placement with Angela M. She opined that J. was "already adjusted" to that placement when she took over his

_____

[9] Ms. Hinkle testified that she did speak to Dr. Tanenbaum about Father's prescribed medications. Dr. Tanenbaum told her that "off the top of his head," he believed Father was prescribed Lithium and Adderall. He did not provide any documentation of those prescriptions, however.

case. That was "his home" and he was always happy to return there after visits with his siblings and Father.

Ms. Hinkle opined that she did not believe "the . . . children would be able to be safe in [Father's care] . . . for several reasons [including] . . . the extent of his criminal history[,] [t]he lack of appropriate stable housing, [and] the lack of knowledge of [Father's] mental health and his treatment[.]" She noted that his recent criminal history was very concerning, particularly because it had involved sexual behavior with and in the presence of minors and the giving of drugs to minors. With respect to Father's mental health, Ms. Hinkle opined that the lack of a definitive diagnosis coupled with the lack of information about his medication protocol made it impossible for her to fully assess the children's safety were they to be returned to Father's care.

Father's unreliable reporting, as detailed by Dr. Rodrigues, also concerned Ms. Hinkle. She explained that the Department could only offer services based upon needs identified by Father and he was not consistent in the information he provided them.

Ms. Hinkle opined that the children's "emotional safety" in the home with Father was "just as important as the[ir] physical safety." H., for example, had a need for "stability" and "reassurance," and she was uncertain that Father could offer that to him. Moreover, to the extent the children needed services, Ms. Hinkle did not think Father would be consistent in following through with those services, based on his demonstrated inability to maintain his own appointments. She did not believe that giving Father additional time would lead to an adjustment in life circumstances that would permit the children to return to his care. Ms. Hinkle emphasized that while Father had been

consistent with visits with the children, there was no evidence that the children's bond with him had increased. They were more "familiar" with Father, but not more attached to him. Their primary attachment remained to their foster parent caregivers.

Ms. Hinkle opined that termination of Father's parental rights to J. would not negatively affect J., emotionally or otherwise. On the contrary, it would have a positive impact in that J. could achieve permanency in his foster home where he had lived as long as he could remember. J.'s foster mother was "more than ready to move through [with adoption]."

Mr. Cox, a licensed clinical social worker for the Department of Corrections, testified that he ran a parenting group called "Inside Out Dad" at RCI. The program lasted between 10 to 15 sessions, with 10 to 18 participants. Father had participated in the Inside Out Dad program, attending 10 out of the 15 group sessions. He had "actively participated in all of the sessions that he was present." He frequently was "disruptive" during group sessions, however, because he would "go off on tangents that weren't related to the topic matter." Father sometimes showed "insight" into his own parenting issues during the group sessions, but other times he "seemed to be at odds with the majority of the group." Mr. Cox recalled Father stating that he would encourage his children to challenge authority, particularly schooling and law enforcement authority, at every turn.

Mr. Cox also had provided release planning to Father. Father identified housing and SSDI as his two most pressing needs upon release. Mr. Cox assisted Father in submitting an online application for SSDI and a "function report." He also looked into

housing options for Father, but his options were extremely limited due to his status as a registered sex offender.

The parties stipulated that Ms. Weinstein, a licensed certified clinical social worker, was an expert in the field of social work. Ms. Weinstein was on medical leave from the Department and was unavailable to testify at the TPR hearing. Her deposition testimony was used in place of live testimony. Ms. Weinstein testified that she was assigned to the children's case as a reunification worker beginning in September 2016 and continuing through the summer of 2017. In her opinion, the children would not be safe if they were returned to Father's care because he had a "lengthy history of violent, inappropriate behaviors" and "mental health" issues. She noted that the Department had "very little information concerning [Father's] mental health[,]" but that he "demonstrated some very concerning behaviors." His refusal to provide releases made it impossible for the Department to fully "ascertain his diagnoses and his medications." Although she believed that he "loves his children very, very much[,]" he had repeatedly demonstrated an inability to provide proper care for them and to keep them safe, physically and emotionally.

Ms. Weinstein explained that Father's criminal history, which involved the recent conviction for fourth-degree sexual offense and a prior conviction for indecent exposure after he masturbated in a locker room in the presence of a staff person, was indicative of his "[in]ability to manage his behavior[,]" particularly "inappropriate sexual[]" behaviors.

Ms. Weinstein's observations during Father's supervised visitation with the children also informed her opinion that he could not provide a safe home for them. She

recounted that he had "demonstrated a poor understanding of child development [and] a poor understanding of his children." He was "willing to allow" the children to engage in behaviors that were wholly inappropriate and failed to intervene or redirect the children appropriately. While he had been calmer and more pleasant since his release from prison, he had not demonstrated that he had learned how to manage his children's needs.

Ms. Weinstein had observed H. hiding and shutting down during visits with Father. H. became "more and more agitated" as the visit continued. E. became "confrontational . . . combative . . . and oppositional" during visits with Father. J. did not "have a relationship with . . . [F]ather." He "avoids" Father during visits, moving away when Father attempts to get close to him. In contrast, J. was extremely bonded to his foster mother and to her family members who assisted in caring for him. Ms. Weinstein opined that, if Father's parental rights in J. were terminated, it would not have any negative impact on him. It would have a positive impact in that J. would be able to be adopted by his foster parent, with whom he has a loving and secure attached relationship.

Father's lack of housing also was a major barrier to reunification. When Ms. Weinstein had spoken to Father about this issue, he had expressed his belief that his post-conviction proceedings would be successful, resulting in his removal from the sex offender registry. He did not have any alternative plans in place should that not come to fruition. Moreover, his only income was SSDI, making it unlikely that he could afford to care for the children even if he could obtain stable housing.

Ms. Weinstein further testified that Father had become "inappropriately irate" with her during supervised visits she facilitated at RCI. In the presence of his two oldest sons,

Father had yelled at and about her.  At another visit, in the presence of all the children, he became irate and accused her of not wanting him to have visits with his children.  This behavior demonstrated his volatility and his inappropriate boundaries, in Ms. Weinstein's view.

At the close of the Department's case, Father moved to dismiss the TPR case.  His motion was denied.

In his case, Father testified and called three witnesses: Aurora Taylor, a behavioral health specialist who provided cognitive behavioral therapy to H. and E.; Ms. Shine; and Traci David, Father's probation officer following a 2011 conviction for indecent exposure and after his 2015 convictions.

Ms. Taylor, a licensed graduate social worker, was accepted by the court as an expert in the field of social work.  She had been providing cognitive behavioral therapy to H. and E. since April 2016.  When E. entered therapy, he was three years old.  "His treatment goals include[d] coping skills, feeling expression, and . . . communication."  He had made progress in all those areas.  His current treatment goal was geared to behavioral issues at school.  She had observed E. in his foster home and he was "attached to his caregivers" and "seem[ed] to be [in] a loving environment."  They provided "stability and support" for him.

H. was diagnosed with general anxiety disorder.  His therapy goals "include coping skills, both social skills for learning and using those social skills and communication."  He sometimes became very anxious during therapy sessions, making it

difficult for him to "engage[]," but was "overall . . . making progress towards his goals[.]"

During the summer of 2017, H. became "very resistant to going to visits [with Father]" and would "get very anxious." Consequently, Ms. Taylor worked with him on relaxation techniques he could use to "ground himself . . . so [that] he was able to attend visits." She also suggested to the Department that H. might benefit from one-on-one time with Father during the group visits with all five siblings because distractions increased his anxiety. The Department determined that it would be difficult to separate the other children from Father and H. during a group visit but arranged for H. to have individual visits with Father thereafter.

Ms. Shine, a licensed clinical social worker, was the supervisor of in-home services at the Department. Beginning in 2014, and until the children were removed from the home in February 2015, she supervised the social worker assigned to the children's case. During that time, the Department was working to "give the family an opportunity with services to see if they could maintain the family intact." If an in-home services worker perceives "sufficient safety issues[, however,] [the Department will] remove the children [from the home]."

During the time Ms. Shine supervised the case, she observed that the children were bonded with Father (and Mother). Also during that time, the Department provided the family with food, gas money, advocacy with the Housing Opportunities Commission due to a pending eviction, assistance with cleaning the apartment, and assistance ameliorating the children's school attendance issues. The major concerns identified by

Ms. Shine were the parents' mental health issues, the "very unclean condition" of the apartment, the parents' pending criminal charges, and J.'s medical issues. Father and Mother did not make progress toward addressing any of those issues while Ms. Shine was involved in the case. Ms. Shine recalled that when J. returned from Ohio, his head was enlarged, and his pediatrician referred him to Children's Hospital for a follow-up assessment. Neither parent kept that appointment. The decision to remove the children from the home in February 2015 was made because there was "food on the floor [and] the [apartment] was filthy[.]"

Ms. David, a senior agent with the Division of Parole and Probation, was accepted as an expert in the "field of general probation supervision of non-sex offenders and sex offenders." She testified that she had met Father in 2011 when she was supervising his probation on an indecent exposure conviction. For approximately 18 months, she made monthly home visits. She observed his home to be "a little cluttered, but not dirty." She did not see him with his children, but he talked about them all the time. In Ms. David's estimation, Father was a more involved parent than Mother. Father did not violate his probation and the "case clos[ed] satisfactorily."

Ms. David also supervised Father's probation following his release from prison in June 2017. Father was subject to standard conditions of probation, including reporting as directed, working or attending school, obeying all laws, submitting to urinalysis as ordered, abstaining from drugs, and registering as a tier one sex offender. Since his release, Father had submitted to one urinalysis on June 20, 2017, one day after his

release.  It had been negative for any illicit substances.  Ms. David had not ordered any further urinalysis testing.

Father had been compliant with all the conditions of his probation.  He reported once a week, either on Tuesday morning or Thursday afternoon, with "a good attitude."  He tried to "remain positive," and she had never observed him to be angry.  He had missed one appointment but had called to tell Ms. David he could not make it.

On September 1, 2017, Ms. David assessed Father to ensure that she was supervising him appropriately.  She determined that he was experiencing a lot of stress related to the TPR proceedings and his lack of stable housing.  Consequently, she decided to keep him on weekly supervision.

In her weekly contact notes, Ms. David noted on more than one occasion that Father's mental health issues prevented him from focusing on more than one condition of probation at a time.  She explained that his main focus since release had been the TPR case and, consequently, she had not pressed him to comply with other conditions, such as mental health counseling, housing, and employment.

Father testified that he had been the primary caregiver for the children until they were removed from the home in 2015.[10]  He took them to the pediatrician, to the dentist, enrolled them in school, grocery shopped, and cooked meals.

---

[10] Father began his testimony near the end of the day on October 17, 2017.  The court adjourned the hearing around 6 p.m. and told counsel and the parties that the hearing would reconvene the next morning at 9:30 a.m.  By 10:17 a.m. on October 18, 2017, Father had not appeared.  His attorney and Ms. Hinkle made numerous unsuccessful attempts to reach him by telephone, calling and texting him on his cell

(Continued…)

-23-

When Father and Mother were arrested in 2014, they arranged for Mother's sister to care for the children in their apartment until they could post bond. Father did not consent to the children being removed to Ohio by Mother's sister, nor was he informed that she planned to do so. When he was released on bond, he returned to his apartment, which was in "horrible condition" due to the police having raided the apartment. He was "overwhelm[ed]" and the "cleanup process was very slow."

Father was able to bring the children back to Maryland in August 2014. At that time, the apartment was "suitable," in his view, although he acknowledged that the broken front door was "not safe." Father "immediately" took J. to see his pediatrician because his head appeared enlarged. The pediatrician referred him to a specialist at Children's Hospital. The earliest appointment the specialist could offer J. was two to three months away. Ultimately, he was forced to reschedule that appointment because he was having car trouble and could not afford another means of transportation.

When the children were removed from the home in February 2015, the apartment was "messy . . . really cluttered," according to Father. He acknowledged that there was food on the floor but stated that that was because he had been trying to clean up the "wreckage."

---

(…continued)

phone and calling the shelter where he was staying. Ms. Hinkle later received a phone call from an EMT who reported that Father was being transported to Shady Grove Hospital by ambulance to be evaluated for chest pains. Father decided to leave the hospital against medical advice and come to the hearing, arriving sometime after noon.

During the first year and two months of Father's incarceration, he had no contact with his children. The Department was ordered to begin facilitating visits in March 2016. Initially, the visits were non-contact visits through a Plexiglas partition. Those visits were "[a]wful." The children could only communicate with him by using a phone. By July 2016, however, Father was allowed contact visits with the children. According to Father, those visits were "excellent."

Since Father's release from prison on June 19, 2017, he had been living "[o]n the streets" and sleeping at a homeless shelter. In September 2017, he began receiving $723 per month in SSDI. He was working with a "housing locator" to locate a room for rent in a private house. His plan was to find suitable housing and to work toward overnight visits with his sons. He also was pursuing post-conviction relief to attempt to have the requirement that he register as a sex offender vacated. If he were unsuccessful in that regard, his alternative plan was to move to Ohio to find cheaper housing and be closer to his sister and other relatives.

Father testified that he had monthly appointments with Dr. Tanenbaum and was prescribed Lithium and Adderall. He had been prescribed Celexa, an anti-depressant, while at RCI, but he did not like the way it made him feel. Dr. Tanenbaum had not prescribed it to him upon his release. He took his prescribed medications daily.

Father believed that he had a "degree" of "bipolar," but that it was "circumstantial . . . due to whatever [he was] going through . . . ." He had been diagnosed with bipolar disorder sometime after his first son was born and around the time his second son was born. He decided to seek mental health treatment because he knew he was "different"

and he wanted to see how doctors would "perceive [him]" and whether they could help him be more functional. He intended to take his medication unless and until his doctor told him he could stop.

Father disputed that he had withheld aspects of his criminal history during his psychological evaluation with Dr. Rodrigues. He explained that he did not include charges that were dismissed. He also did not include charges from when he was a juvenile and was not living in Maryland because they were beyond the scope of the question as posed by Dr. Rodrigues.

According to Father, his relationship with the children had improved since his release. J. in particular had become more bonded to him and had recently started calling him "daddy." H. and E. both ran up and hugged him at the start of visits and climbed all over him.

Father believed it would negatively impact H., E., and J. if the TPR petitions were granted. He explained that they knew him as their father and they loved him. Father had been raised without a father and he did not want his children to experience that absence. He also wanted all five of his children to be raised together and to know their extended family.

On cross-examination, Father was asked about his employment history. He testified that he had never had a full-time job. He once worked at the Navy Yard for about 6 months but could not recall what year that was. He had not disclosed that job during his deposition testimony, however. Since his release from prison, he had been

working occasional landscaping jobs. He gave the names of two individuals who had hired him for landscaping work.

On November 3, 2017, the juvenile court issued a forty-nine-page memorandum opinion and separate orders, which we shall discuss in greater detail, *infra*. The court found by clear and convincing evidence that Father was unfit to continue in a parental relationship with H., E., and J. and that the children's best interests would be served by permitting them to achieve permanence in adoptive homes. For those reasons, the court granted the petitions and terminated Father's parental rights in the children.

This timely appeal followed. We shall include additional facts in our discussion of the issues.

## STANDARD OF REVIEW

"In reviewing a juvenile court's decision with regard to termination of parental rights, we utilize three different but interrelated standards." *In re Adoption of Ta'Niya C.*, 417 Md. 90, 100 (2010).

> "When the appellate court scrutinizes factual findings, the clearly erroneous standard of [Rule 8–131(c)] applies. [Second,] [i]f it appears that the [court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [court's] decision should be disturbed only if there has been a clear abuse of discretion."

*In re Adoption/Guardianship of Victor A.*, 386 Md. 288, 297 (2005) (alteration in *In re Victor A.*) (quoting *In re Yve S.*, 373 Md. 551, 586 (2003)).

A court abuses its discretion when "'"the decision under consideration [is] well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable."'" *In re Adoption/Guardianship of Jasmine D.*, 217 Md. App. 718, 734 (2014) (quoting *In re Shirley B.*, 419 Md. 1, 19 (2011), in turn quoting *In re Yve S.*, 373 Md. at 583–84)).

## DISCUSSION

### I.

Father contends the juvenile court erred by taking judicial notice of the contents of the children's CINA court files, including the court orders, attachments, and petitions. Although he agrees that there were some facts contained therein that were appropriate for judicial notice, he asserts that there also were numerous facts subject to reasonable dispute that were not properly noticed and that the court relied upon in deciding to terminate his parental rights in the children. Father further argues that the court erred by admitting into evidence records from his criminal cases, including a sentencing memorandum, because those documents contained numerous inadmissible hearsay statements, not subject to any hearsay exceptions.

The Department responds that the court properly took judicial notice of the CINA orders and the Department's reports to the court, which were incorporated into those orders, as well as the court records from Father's criminal and post-conviction cases. It maintains that the Department's court reports also properly were admitted under the public records exception to the rule against hearsay and that the sentencing memorandum

in Father's criminal case properly was admitted because Dr. Rodrigues relied upon it in forming his expert opinions.[11]

### a.

### CINA Orders and Petitions

Before trial, the Department moved the juvenile court to take judicial notice of the children's CINA court files, which contained the original CINA petition, the first amended CINA petition, the CINA adjudication and disposition order, and various ancillary court orders entered in the CINA cases. Father opposed the motion, arguing that the allegations in the CINA petition and the first amended CINA petition were not appropriate for judicial notice because they were subject to reasonable dispute. The court disagreed and on the first day of the TPR hearing admitted the prior CINA orders and petitions over Father's objection.

We perceive no error. "A court shall take judicial notice if requested by a party and supplied with the necessary information." Md. Rule 5-201(d). A fact is appropriate for judicial notice if it is "not subject to reasonable dispute," meaning the fact must "either (1) [be] generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Id*. "[P]ublic records such as court documents" are some of the most common of the "types of information [that] can fall under the umbrella of

---

[11] The children's attorney also filed a brief in this Court, but it does not address Father's evidentiary challenges.

judicial notice." *Abrishamian v. Washington Med. Grp., P.C.*, 216 Md. App. 386, 413 (2014).

As Father acknowledges, the CINA orders entered by the juvenile court are the type of public records that are appropriate for judicial notice. At the March 11, 2015 CINA adjudication hearing, Father (and Mother) stipulated to the facts alleged by the Department in the first amended CINA petition. Father did not simply stipulate generally to a CINA determination or only to some facts. He stipulated to all the facts alleged, and indeed in the Adjudication and Disposition Order, the juvenile court referenced the "agreement by all parties [including Father] to the facts and recommendations contained in the attached First Amended CINA Petition." Thus, the facts alleged in the first amended petition were incorporated in and formed the basis for the juvenile court's finding that the children were CINA.

The facts alleged in the first amended CINA petition, having been stipulated to by Father and incorporated into the Adjudication and Disposition Order, were not subject to reasonable dispute. For that reason, the court properly took judicial notice of them and allowed them to come into evidence at the TPR hearing.[12] Father still could testify and give evidence about the circumstances under which he stipulated to those facts, and the court could consider that in determining what weight to ascribe to them. The court ruled properly in taking judicial notice, however.

---

[12] The original CINA petition also was part of the children's CINA file. That petition did not differ in any material respect from the first amended CINA petition and, thus, any error in its admission was not prejudicial to Father.

**b.**

**CINA Court Reports**

The Department also moved the juvenile court to admit seven reports prepared by Department social workers, each one in advance of a permanency plan review hearing in the children's CINA cases (the "Court Reports"). It maintained that the Court Reports, which are part of the children's CINA court files, were appropriate for judicial notice and also were admissible under the public records exception to the rule against hearsay. Father opposed the motion. On the first day of the TPR hearing, the juvenile court admitted the seven Court Reports over Father's objection.

The Court Reports, which range in length between 13 and 24 pages, were prepared on July 3, 2015; January 19, 2016; June 23, 2016; November 22, 2016; February 27, 2017; May 2, 2017; and July 28, 2017. Each Court Report was signed by the social workers who prepared it and by their supervisor(s). The first three Court Reports were authored by Ms. Morton-Warren and another social worker who did not testify at the TPR hearing; the next three Court Reports were authored by Ms. Morton-Warren and Ms. Weinstein; and the final Court Report was authored by Ms. Morton-Warren, Ms. Weinstein, and Ms. Hinkle. Each Court Report gave the date it was prepared and the date of the upcoming hearing and was addressed to "The Honorable Judges of the Circuit Court for Montgomery County Sitting as a Juvenile Court." The header included the names, dates of birth, and current ages of each child in the case; and the names, dates of birth, and current addresses (if known) of the parents. The body of the reports included information about the children's placements, the parents' location and child support

status, the history of the CINA cases, the current permanency plan, the Department's recommendations for the children and the parents going forward, the "reasonable efforts" made by the Department toward the permanency plan since the most recent hearing, the children's "progress under supervision," the parents' progress, visitation history, and information bearing on each of the permanency planning factors set forth in Md. Code (1999, 2012 Repl. Vol.), section 5-525(f)(1) of the Family Law Article ("FL").[13]

Under pertinent provisions of Rule 5-803(b)(8)(A), "a memorandum, report, record, statement, or data compilation made by a public agency setting forth . . . matters observed pursuant to a duty imposed by law, as to which matters there was a duty to report" is not excluded from evidence as hearsay.  However, "[a] record offered pursuant to paragraph (A) may be excluded [by the court] if the source of information or the

---

[13] Maryland Code (1999, 2012 Repl. Vol.), section 5-525(f)(1) of the Family Law Article ("FL") requires that a

> local department . . . consider the following factors in determining the permanency plan that is in the best interests of the child:
>     (i) the child's ability to be safe and healthy in the home of the child's parent;
>     (ii) the child's attachment and emotional ties to the child's natural parents and siblings;
>     (iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;
>     (iv) the length of time the child has resided with the current caregiver;
>     (v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and
>     (vi) the potential harm to the child by remaining in State custody for an excessive period of time.

method or circumstance of the preparation of the record indicate that the record or the information in the record lacks trustworthiness." Md. Rule 5-803(b)(8)(B).

In *Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581 (1985), decided based on Maryland common law prior to the adoption of Rule 5-803, the Court reviewed the common law public records hearsay exception:

> *McCormick on Evidence* § 315, at 888 (E. Cleary 3d ed. 1984) describes the common law exception for public records: "The common law evolved an exception to the hearsay rule for written records and reports of public officials under a duty to make them, made upon firsthand knowledge of the facts. These statements are admissible as evidence of the facts recited in them."

> The modern trend has been to admit public records when the information is gathered by a public officer under a statutory duty to investigate and record or certify facts ascertained by other than personal observation. 5 J. Wigmore, *Evidence* § 1635, at 531 (3d ed. 1940) states:

> > Now there may be cases in which the officer's duty clearly does involve his ascertainment of facts occurring out of his presence and requiring his resort to sources of information other than his own senses of observation; for example, an assessor's record of the value of real estate and its occupancy, or a registrar of voters' record of electors' residences. When such a duty clearly exists, the general doctrine above, that a witness should have personal knowledge, need not stand in the way, for (as already noted) it has its conceded limitations; and where the officer is vested with a duty to ascertain for himself by proper investigation, this duty should be sufficient to override the general principle. It is true that due caution should be observed before reaching the conclusion that the law has in fact in a given case intended to invest the officer with such an unusual duty. But when it clearly appears that a duty has been prescribed to investigate and to record or certify facts ascertained other than by personal observation, then it follows that, in accordance with the general principle of the present exception, the statement thus made becomes admissible.

*Id.* at 604–05.

The Court also discussed Rule 803(8) of the Federal Rules of Evidence, from which Maryland Rule 5-803(b)(8) later was adopted, stating:

> Initially, some courts expressed concern over the admission of reports where the government official did not appear to have firsthand knowledge of the facts. There is now general recognition, however, that the hearsay nature of the evidence is a factor to be considered in determining the presence or absence of trustworthiness, but the presence of any level of hearsay does not, by that fact itself, render the report untrustworthy.

*Id.* at 607–08. The Court concluded that public records carry a "presumption of reliability" and that the public records exception "appropriately allows the reception of reliable facts[.]" *Id.* at 612. It warned that "'factual findings' will be strictly construed and that evaluations or opinions contained in public reports will not be received unless otherwise admissible under this State's law of evidence." *Id.* (footnote and citations omitted).

The *Ellsworth* Court further concluded that "the burden rests upon the party opposing the introduction of a public record to demonstrate the existence of negative factors sufficient to overcome the presumption of reliability[.]" *Id.* at 612. Such "[i]ndicia of unreliability may be contained in the report itself, or may be disclosed by the evidence of the party offering the report." *Id.*

Father contends the juvenile court erred by admitting the Court Reports under the public records exception to the rule against hearsay because they were "prepared in anticipation of litigation" with "cherry pick[ed] facts from a much larger record for an adversarial proceeding." We disagree. The Court Reports document the activities of the

-34-

Department in furtherance of the children's permanency plans to meet the children's needs. They were prepared by the Department pursuant to a duty imposed by law. *See* Md. Code (1973, 2013 Repl. Vol.), § 3-826(a)(1) of the Courts & Judicial Proceedings Article (requiring the Department to "provide all parties with a written report at least 10 days before any scheduled disposition, permanency planning, or review hearing . . . ."); COMAR 07.02.11.20 (requiring the Department to "[p]repare a written report setting forth the local department's recommendations; and . . . [p]rovide the report to the court, the child's attorney, and the child's parents or legal guardian" at least ten days before a permanency planning hearing). Thus, the Court Reports were presumptively admissible under Rule 5-803(b)(8)(A) unless Father could show that they were unreliable.

Father did not satisfy his burden to show that the Court Reports lacked trustworthiness. He argued, generally, in opposition to admission of the Court Reports that the social workers who authored the reports were representatives of the Department, his adversary, and the reports were "self-serving position papers." The reports do not bear this out. They largely comprise factual recitations about routine matters, such as the children's academic progress, their medical appointments, the dates and times of contacts between the Department and the parents, and referrals made for the parents and the children.

Finally, to the extent that any portions of the Court Reports containing the social workers' conclusions and opinions may not have been admissible under the public records exception, any error in admitting them was harmless. The opinions offered in the Court Reports about the children's attachment to their caregivers and to Father, Father's

inability to parent the children, and Father's mental health were cumulative of the opinion testimony given by Ms. Morton-Warren, Ms. Weinstein, and Ms. Hinkle at the TPR hearing, which was subject to cross-examination.

**c.**

**Sentencing Memorandum**

Father contends the juvenile court erred by admitting a sentencing memorandum prepared by the State's Attorney's Office in his criminal case. The court admitted the sentencing memorandum pursuant to Rule 5-703(b), for the limited purpose of "forming the basis of the opinion of [Dr. Rodrigues]." That Rule provides that "[i]f determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts or data reasonably relied upon by an expert pursuant to section [5-703](a) may, in the discretion of the court, be disclosed to the [fact-finder] even if those facts and data are not admissible in evidence." Provided that those elements are met, the "facts or data" may be admitted into evidence for the purpose of assessing the credibility of the expert. *See Lamalfa v. Hearn*, 457 Md. 350, 382 (2018).

Dr. Rodrigues testified that he relied upon the State's sentencing memorandum in adding the provisional diagnosis of ASPD to his previously made diagnosis of bipolar disorder. The sentencing memorandum detailed a criminal history on Father's part that Father had not disclosed to Dr. Rodrigues during the psychological evaluation. Specifically, the sentencing report disclosed convictions in Ohio for aggravated burglary, abduction, kidnapping with a gun, and aggravated menacing, committed when Father was a juvenile but charged and tried against him as an adult. In its Memorandum Opinion, the

juvenile court did not recite the facts on which these convictions were based, but simply said that they had not been disclosed to Dr. Rodrigues and that Dr. Rodrigues used them to reach his provisional diagnosis of ASPD. This was a proper use of the sentencing report to assess Dr. Rodrigues's credibility in reaching his diagnoses.

## d.

### Criminal Case File and Post-Conviction Case File

Finally, Father contends the juvenile court erred by taking judicial notice of the Circuit Court for Montgomery County case files from his 2014 criminal case and his related 2016 post-conviction case. As discussed, court records are a type of record commonly subject to judicial notice. Although there may have been documents in the court files that were not appropriate for judicial notice, any error in the admission of the entire files was harmless because the court relied upon the case file only to find that Father had been convicted of CDS crimes. This is precisely the type of fact that is appropriate to be judicially noticed.

## II.

"In order to terminate a parent's parental rights, the State must prove by clear and convincing evidence that such a termination was in the child's best interests." *In re Adoption/Guardianship of Quintline B. & Shellariece B.*, 219 Md. App. 187, 206 (2014), (citing *In re Priscilla B.*, 214 Md. App. 600, 622 (2013)). Parents have a fundamental right to raise their children. *In re A.N., B.N. & V.N.*, 226 Md. App. 283, 306 (2015); *accord Troxel v. Granville*, 530 U.S. 57, 66 (2000). The law presumes that a child's best interests are served by remaining with his or her natural parents, but "the parents' right is

not absolute and 'must be balanced against the fundamental right and responsibility of the State to protect children, who cannot protect themselves, from abuse and neglect.'" *Ta'Niya C.*, 417 Md. at 103 (quoting *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 497 (2007)). "This presumption, however, may be 'rebutted only by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest.'" *Quintline B.*, 219 Md. App. at 206 (quoting *Rashawn H.*, 402 Md. at 498).

In deciding whether to terminate parental rights, the juvenile court must analyze the factors set forth in Md. Code (1999, 2012 Repl. Vol.), section 5-323(d) of the Family Law Article ("FL").[14] In doing so, the court

---

[14] FL § 5-323(d) provides:

Except as provided in subsection (c) of this section, in ruling on a petition for guardianship of a child, a juvenile court shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests, including:
    (1)(i) all services offered to the parent before the child's placement, whether offered by a local department, another agency, or a professional;
    (ii) the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent; and

    (iii) the extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any;

(2) the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home, including:
    (i) the extent to which the parent has maintained regular contact with:
        1. the child;

(Continued…)

2. the local department to which the child is committed; and

3. if feasible, the child's caregiver;

(ii) the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so;

(iii) the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and ongoing physical or psychological needs for long periods of time; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement unless the juvenile court makes a specific finding that it is in the child's best interests to extend the time for a specified period;

(3) whether:

(i) the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect;

(ii) 1. A. on admission to a hospital for the child's delivery, the mother tested positive for a drug as evidenced by a positive toxicology test; or

B. upon the birth of the child, the child tested positive for a drug as evidenced by a positive toxicology test; and

2. the mother refused the level of drug treatment recommend by a qualified addictions specialist, as defined in § 5–1201 of this title, or by a physician or psychologist, as defined in the Health Occupations Article;

(iii) the parent subjected the child to:

1. chronic abuse;

2. chronic and life-threatening neglect;

3. sexual abuse; or

4. torture;

(iv) the parent has been convicted, in any state or any court of the United States, of:

1. a crime of violence against:

A. a minor offspring of the parent;

B. the child; or

C. another parent of the child; or

2. aiding or abetting, conspiring, or soliciting to commit a crime described in item 1 of this item; and

(v) the parent has involuntarily lost parental rights to a sibling of the child; and

(Continued…)

must keep in mind "three critical elements." First, the court must focus on the continued parental relationship and require that "facts . . . demonstrate an unfitness to have a continued parental relationship with the child, or exceptional circumstances that would make a continued parental relationship detrimental to the best interest of the child." Second, the State must show parental unfitness or exceptional circumstances by clear and convincing evidence. Third, the trial court must consider the statutory factors listed in [FL § 5-323](d) to determine whether exceptional circumstances warranting termination of parental rights exist.

*Ta'Niya C.*, 417 Md. at 103–04 (internal citations and footnotes omitted). Above all, in this consideration, """"the best interest of the child remains the ultimate governing standard."""" *Quintline*, 219 Md. App. at 206 (quoting *In re Adoption/Guardianship of Jayden G.*, 433 Md. 50, 68 (2013), in turn quoting *Rashawn H.*, 402 Md. 477, 496 (2007)).

The first FL section 5-323(d) factor concerns the "services offered to the parent before the child's placement," "the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent" after the child is in an out-of-home placement, and "the extent to which a local department and parent have fulfilled

---

(…continued)
(4)(i) the child's emotional ties with and feelings toward the child's parents, the child's siblings, and others who may affect the child's best interests significantly;
(ii) the child's adjustment to:
1. community;
2. home;
3. placement; and
4. school;
(iii) the child's feelings about severance of the parent-child relationship; and
(iv) the likely impact of terminating parental rights on the child's well-being.

their obligations under a social services agreement, if any." FL § 5-323(d)(1). The juvenile court found, based upon the stipulated facts in the amended CINA petition *and* Ms. Shine's testimony, that the Department made numerous efforts to keep the children in the home beginning in October 2014, after Father picked them up in Ohio, and continuing through February 2015, including providing "financial support, food, advocacy with the housing opportunit[ies] commission, cleaning, assistance with school attendance, assistance with stress dealing with children and criminal charges, and transportation." The efforts ultimately "proved futile" and removal was necessitated by the condition of the home, the parents' failure to take J. for a follow-up appointment at Children's Hospital for his hydrocephaly, and the parents' pending criminal charges.

The juvenile court found that the Department also provided numerous services to Father after the children were removed, even though its ability to facilitate reunification was severely hampered by Father's incarceration for two years and three months. The Department nevertheless facilitated the court-ordered visitation with Father, kept in contact with his case manager at prison, and permitted him to have "unlimited written contact" with the children. The visits initially were non-contact visits due to the Department's concerns about Father's mental health based upon an evaluation at Patuxent, but Father's visits transitioned to contact visits by the end of his incarceration. After Father's release from prison, the Department held a family involvement meeting with Father and asked him to sign a service agreement.

The juvenile court found that the services offered "were timely and reasonable under the circumstances." The court noted that Father's incarceration "limited" the

Department's ability to provide services and some services it would have provided, such as referrals for therapy, substance abuse treatment, and parenting classes, would have been redundant of services available to Father in prison. The juvenile court rejected Father's argument that the denial of visits for the first year of his incarceration was unreasonable. As discussed, the March 16, 2015 Adjudication and Disposition Order directed that the children would not have "in-person access with Father at his correctional facility, pending further review . . . ." The visitation restrictions were continued in an August 3, 2015 permanency planning review order. Thereafter, Father moved to revise the visitation order and that motion was heard at a March 4, 2016 permanency planning review hearing. At that time, the juvenile court ordered that Father be allowed monthly visits with the children. The Department complied with that order, facilitating monthly visits for the remainder of Father's incarceration. The juvenile court concluded that the Department's efforts relative to visitation were reasonable.

The juvenile court further found that the Department "substantially fulfilled" its obligations under service agreements entered into with Father. It found that its attempts to provide services were "thwarted by [Father]'s last-minute scheduling conflicts and other forms of evasion."

Father failed to sign or return two service agreements that were mailed to him during his incarceration, dated December 16, 2016, and July 2, 2016. He signed his first service agreement, provided to him after his release from prison, on July 28, 2017. Since then, he had "selectively complied with tasks assigned to him." He was mostly consistent

with visitation, although he had missed two visits while in prison.[15]  Father discounted the need for substance abuse treatment, despite having been convicted of distribution of CDS; and discounted the need for anger management and parenting classes.

Father also refused to provide information to the Department that would have permitted it to refer him for additional services, such as mental health therapy.  The juvenile court found that Father's refusal to sign releases pertaining to his psychological/psychiatric treatment "created uncertainty as to [his] psychiatric diagnosis" and that Father was attempting to use the Department's lack of information as a "sword as well as a shield."  Father's refusal to sign releases also prevented the Department from confirming that he was not abusing amphetamines based upon his positive urinalysis test result.

Father had not complied with the Department's requests that he complete anger management classes and the Responsible Fathers Program.  There was evidence in the record that both requests were reasonable.  He also had not met with a parenting coach selected by the Department, having cancelled the appointment the same day it was scheduled to take place.  Overall, the evidence demonstrated a "common pattern," in the juvenile court's view:  Father often developed last-minute conflicts that prevented him from complying with the service agreement but failed to provide proof of the conflicts.

---

[15] He refused one visit because it would be a no-contact visit, and he missed a second visit because he self-reported that he had swallowed a razor blade, resulting in his transfer to Patuxent for intensive mental health treatment.  An x-ray taken by the prison medical ward did not reveal a razor blade.

Under the second FL section 5-323(d) factor, the juvenile court considered whether Father had "adjust[ed] [his] circumstances, condition, or conduct to make it in the [children's] best interests for the child[ren] to be returned to the parent's home." FL § 5-323(d)(2). First, the court considered Father's efforts to maintain regular contact with the children. It noted that Father provided little evidence that he wrote to his children regularly prior to the commencement of in-person visits during his incarceration. It reiterated that Father had missed two of his monthly supervised visits during his incarceration. Since his release from prison, Father had not missed any visits, however.

Father's efforts to maintain regular contact with the Department had been "adequate" in the court's view. He was not allowed contact with the children's caregivers.

Father had not made financial contributions to the children's care because he was unable to do so. He was homeless and living in a men's shelter. He claimed to have landscaping jobs and he recently had begun receiving SSDI, but he had not provided the Department with any proof of his income.

The juvenile court found that Father's "severe mental health issues" put him at "great risk" of being unable to provide for the children's physical and psychological needs. As discussed, the court found that the extent of Father's mental health needs was unknown. The juvenile court credited Dr. Rodrigues's testimony that Father had bipolar disorder, possibly with psychosis, and that he also potentially met the criteria for ASPD, and that Father's behavior during the psychological evaluation was not consistent with his being medicated (or adequately medicated) for those conditions. The court

-44-

emphasized Father's statements to Dr. Rodrigues that he believed that his bipolar disorder was "*situational*" and that he would not need to be medicated long term. (Emphasis in original.) The court disbelieved Father's testimony that he would continue taking his medication so long as recommended by his medical providers.

The juvenile court was particularly concerned about the evidence that Father had experienced auditory hallucinations in the past, as he had reported to staff at RCI, because a psychotic episode would create a "great risk to the health and safety of the children." Father had not provided any evidence that he was taking anti-psychotic medications.

The provisional diagnosis of ASPD also caused the juvenile court significant concern. Dr. Rodrigues had testified that that disorder did not have a "good prognosis," but that better treatment options were becoming available. Successful treatment was dependent upon a firm diagnosis and mandated treatment because most patients with ASPD do not see themselves as needing treatment. Father's failure to fully report his criminal history and his history of mental health diagnoses to Dr. Rodrigues had hampered the accuracy of the evaluation, however.

The juvenile court found that Father's mental health issues would prevent him from meeting the children's needs. J. had a history of hydrocephaly and required "rigorous follow-up with multiple professionals." In the past, Father had not demonstrated that he could manage J.'s medical needs or his own. H. suffered from generalized anxiety disorder and attended weekly therapy sessions. His anxiety was triggered by frightening memories from when he lived with Mother and Father and often

became worse in anticipation of visits with Father and following those visits. Father seemed "oblivious" to H.'s anxiety and perceived, contrary to what the social workers observed, that H. was very close to him. Father's incongruent impressions of H.'s attachment to him and anxiety levels during visits was consistent with Dr. Rodrigues's opinion that grandiosity, a symptom of bipolar disorder, could inhibit Father from assessing his own parenting skills and weaknesses. E. also had anxiety and behavioral issues that were triggered by visits with Father. In the court's view, Father lacked the skills and insight to meet E.'s needs for structure and discipline.

The juvenile court found that additional services were not "likely to bring about a lasting parental adjustment so that the child could be returned to the parent." FL § 5-323(d)(2)(iv). Father had "shown a complete inability to acknowledge his deficiencies as a parent and his mental health issues." He had declined services offered by the Department to address those deficiencies. He had "little insight into his own mental health condition [making him] unlikely to improve." Father's "track record [relative to completing services was] abysmal" and he had difficulty, due to his mental illness, "accept[ing] and absorb[ing] criticism."

The third FL section 5-323(d) factor concerns whether the parent has been found to have engaged in abuse or neglect of the children. The juvenile court found that Father had been found to have neglected the children in 2015, when the children initially were removed, and that Father had stipulated to facts alleged in the first amended CINA petition detailing the neglectful conduct. Specifically, the home was in a state of total

-46-

disarray, with trash and food waste everywhere, and Father had failed to take J. to his appointment at Children's Hospital.

Finally, under the fourth FL section 5-323(d) factor, the court made findings about the children's attachment to Father and to each other. J. had "no emotional ties [to Father]." He viewed him with "discomfort and suspicion." J. had spent two thirds of his life, since he was eleven months old, with his foster mother. The court rejected Father's testimony that J. called him "daddy," believing Ms. Hinkle and Ms. Weinstein's testimony to the contrary.

The court found that H. and E. knew Father was their father, and cared for him, but suffered anxiety over visits with him and were always happy to return to their foster home after visits. They both exhibited problematic behavioral issues after visits with Father and often fell asleep, a sign that the visits caused them stress. H., E., and J. were very bonded to each other and to their older brothers and maternal half-siblings. Angela M. wanted to facilitate visits between J. and his siblings.

The court found that J. had adjusted well to his placement with Angela M. He was integrated into her extended family and her community. He was on a swim team, was taking karate classes, and attended family and community events with his foster mother. He considered his foster care placement to be his home and Angela M. to be his mother. When J. was placed in Angela M.'s care, he had significant developmental delays related to his hydrocephaly, but he now was considered developmentally normal.

H. and E. were similarly well-adjusted. They attended church with their foster parents each weekend, were included in family and holiday activities, and were well

integrated into their school community. They benefited from the loving, structured environment provided in their foster placement. Their foster parents were actively involved in H. and E.'s school and monitored their behavioral and academic progress.

The juvenile court found that J. would not have "any feelings about the severance of the parent child relationship." The impact of terminating Father's parental rights in J. would be "positive" because he would be eligible to be adopted by Angela M. H. and E. were more likely to have "negative feelings" but also were likely to feel relief given their anxiety surrounding visits with Father. H. and E. were negatively affected by their relationship with Father and termination of his parental rights would "minimize [H.'s and E.'s] stress and allow for them to stabilize emotionally in a permanent home." The net impact of termination of Father's parental rights in H. and E. would be positive. They would continue to live in a stable home environment and the Department could access adoptive resources that were not available pre-termination.

Based on these factual findings, none of which were clearly erroneous, the juvenile court determined by clear and convincing evidence that Father was unfit to continue in a parental relationship with the children and that termination of Father's parental rights in the children was warranted. The court plainly did not abuse its discretion in so ruling. The evidence overwhelmingly showed that while the children were in Father's care, they had lived in squalor and were exposed to unstable and criminal activity in the home. Father had not demonstrated an ability to manage his severe mental health issues and, thus, the same issues that had caused the children to be removed from his care were likely to recur. Father was an unreliable reporter and was

unable to acknowledge, much less address, his treatment needs. Since the children had been removed from Father's care, he had twice required inpatient psychiatric care—first when he was released from pre-trial supervision and second when he reported swallowing a razor blade to RCI staff. This was evidence that Father's mental illness was not being adequately treated. The court did not err by finding that Father was unfit to continue in a parental relationship with the children and that it would be in the children's best interests to terminate Father's parental rights.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**